OPINION OF THE COURT
Kaye, J.
This appeal — in a case seeking damages for the replacement of defective floor tiles throughout plaintiff owner’s housing complex — presents two discrete issues: first, whether plaintiff can recover its replacement costs against the tile manufacturer in tort (strict products liability) or is limited to contract remedies and second, whether the flooring subcontractor should be indemnified by the tile manufacturer on a theory of breach of implied warranty.
For the reasons that follow, we conclude that plaintiffs tort claim against the tile manufacturer should have been dismissed, and that the flooring subcontractor’s indemnification claim should have been submitted to the jury.
In January 1973, plaintiff (Bellevue South Associates) entered into a contract with defendant HRH Construction Corporation for the construction of Henry Phipps Plaza West in New York City. The development was to consist of eight buildings containing 894 rental units intended for middle- and lower-income tenants. Financing was provided through the State Mitchell-Lama program. Included in the terms of the construction agreement was a requirement that Hartco wood foam-backed tiles, manufactured by Tibbals Flooring Company, be used.
*288 HRH entered into a contract with defendant subcontractor Circle Industries Corporation in November 1974, calling for Circle to supply all wood flooring in the development for $702,000. Circle also agreed to indemnify and hold HRH harmless against liability arising out of performance of the subcontract.
Circle then attempted to substitute a flooring tile manufactured by Sykes Flooring Company for the specified Hartcp tile. (Sykes later merged into defendant Masonite Corporation, and will be referred to as Masonite.) Prior approval of substitutions by the project architect and the Department of Housing and Community Renewal, the State supervisory authority, was required. At this time, Masonite did not manufacture a hardwood floor tile with an attached foam backing, and the sample submitted by Circle was rejected. The architect — Frost Associates — insisted that any substitution conform to the attached-backing requirement. Masonite then purchased equipment that enabled it to attach the foam backing to the tile and submitted a second sample.
The Masonite substitution was approved by Frost on condition that the adhesive coverage — binding the tile to the foam backing — match the 100% coverage of the Hartco tile. While Masonite acknowledged that its tile had only 60% adhesive coverage, Circle argued that there was no specification for adhesive coverage in the contract documents, that the only requirement was an attached foam backing. In August 1975, Frost and the Department of Housing and Community Renewal approved the Masonite tile.
At the time of discussions regarding product substitution, Circle, through a subsidiary, owned a 50% interest in Masonite. That interest — held until September 1976 — was not disclosed to HRH or Bellevue.
The first sale was made by Masonite to Circle in August 1975, and delivery took place between September 1975 and August 1976. All flooring work was completed by September 1976, when tenants began to occupy the rental units. By spring, there were problems with the tiles. A failure of the adhesion between the wood slats and foam backing — a process known as delamination — caused the slats to become loose and break free of the foam. Delamination was first reported in units occupied by wheelchair users.
In September 1977, Masonite reported that the adhesion failure was due to the wheelchair traffic, and that the tile had *289 never been designed to withstand such use. Masonite recommended replacement with rigid nine-inch square block tiles, which HRH completed at no cost to the owner. By January 1978, however, Masonite tiles had begun to fail throughout the complex. Frost concluded that the failures were due to defective materials. In July 1979, HRH and Circle proceeded to replace tiles that had delaminated.
In the summer of 1980, while delamination continued, HRH and Circle refused to undertake further spot replacement. At this time, a rent increase application was being filed, prompting plaintiff to solicit bids for a program to replace the Masonite tile with the Hartco tile on an ongoing basis. As of 1986, Hartco tiles had been installed in 868 units at a cost of $1.7 million. It was projected that the cost of replacing the remaining tiles would be $400,000.
This action was commenced in June 1980. Plaintiff sued HRH and Circle on theories of breach of contract, breach of express warranty, breach of implied warranty of merchantability, and negligence. Plaintiff also sued Masonite for breach of implied warranty, negligence and in strict tort liability. Circle cross-claimed against Masonite for common-law indemnification. Damages alleged included the cost of removing and replacing the defective tiles, additional design and construction costs, carting costs, loss of rental income and diminution of value of the housing project.
The trial court dismissed plaintiff’s Uniform Commercial Code claims for breach of implied warranty against all three defendants on the theory that none had supplied goods to plaintiff. All claims against Masonite, except the cause of action in strict products liability, were also dismissed. In addition, the court dismissed plaintiff’s negligence claim against Circle and Circle’s implied warranty claim against Masonite.
In its verdict sheet, the jury answered that HRH and Circle were liable to plaintiff for breach of contract, for which the jury separately awarded damages of $310,800 against HRH, and $620,600 against Circle. As to Masonite, the jury answered that the tile was defective when it left the factory and that the defect was a proximate cause of plaintiff’s damages, and it fixed damages against Masonite in the amount of $1,157,900. No indemnification was allowed by the jury, but the trial court granted judgment notwithstanding the verdict on HRH’s contractual indemnity claim against Circle.
*290 The Appellate Division affirmed the judgment, holding that Circle was not entitled to indemnity from Masonite because of its relationship with that company and its involvement in the manufacture of the Masonite tile. The court also rejected Masonite’s argument that strict liability could not include plaintiffs economic damages, finding that any such limitation did not extend to situations where the condition caused by the defective product is unduly dangerous. From that affirmance, both Masonite and Circle have appealed.
Plaintiffs Tort Claim Against Masonite
Masonite challenges plaintiff’s verdict against it on the ground that the damages sought were not recoverable under tort law. Plaintiff responds that the floor tile was unduly dangerous, making the manufacturer strictly liable in tort for any damage resulting from the defective product.
The doctrine of strict products liability grew out of a public policy judgment that, with increasingly sophisticated, mass-marketed technologies, consumers hurt by defective products needed greater protection than that afforded by the law of warranty (see, East River S. S. Corp. v Transamerica Delaval, 476 US 858, 866; Codling v Paglia, 32 NY2d 330, 340-341; see generally, 2 American Law of Products Liability § 16:4, at 15 [3d ed]). In developing this doctrine — which allows injured consumers to be compensated by remote manufacturers of defective products, regardless of privity, foreseeability or due care — courts of recent decades have reasoned that the manufacturers could better sustain the losses, which could be spread among all their customers (see, Continental Ins. v Page Eng’g Co., 783 P2d 641, 648-649 [Wyo]; Laurens Elec. Coop. v Altec Indus., 889 F2d 1323, 1324 [4th Cir]).
Whether this extraordinary tort doctrine should be extended to cases where a product fails to meet the expectation of a commercial customer, where the claimed injury is solely to the product itself, and where the only damages sought are replacement costs, is a question that has concerned several courts, with varying outcomes.
In one of the earliest cases, New Jersey’s Supreme Court allowed the purchaser of defective carpeting to recover from the manufacturer on a theory of strict liability (Santor v A & M Karagheusian, 44 NJ 52, 207 A2d 305). Plaintiffs only *291 injury in that case was the reduced value of the carpet — when installed it showed an unusual line.[1]
A contrary view was adopted by the Supreme Court of California in Seely v White Motor Co. (63 Cal 2d 9, 403 P2d 145), a case involving an allegedly defective truck. The court held that the economic loss suffered by the plaintiff — including cost of repair and lost profits — could only be recovered under contract law. In such a case, the court concluded, the manufacturer can only be charged with the risk that its products will not match the purchaser’s economic expectations if it agrees to assume that risk. Finally, the court appears to have left room for a claim for property damage to the product itself in cases where that damage flows from a manufacturing defect (63 Cal 2d, at 19, 403 P2d, at 152).
The only case to present the issue to us was Schiavone Constr. Co. v Mayo Corp. (56 NY2d 667, revg on dissent 81 AD2d 221, 227-234), a strict liability claim for damage to a defective truck hoist. We concluded — with the Appellate Division dissenters — that a tort cause of action could not be sustained for product failure, choosing the approach of Seely over that of Santor.
In Schiavone, the truck hoist could not withstand ordinary use in the plaintiffs business and eventually had to be sold at a loss. Justice Silverman, dissenting at the Appellate Division, cited Seely to the effect that a manufacturer "can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer’s business unless he agrees that the product was designed to meet the consumer’s demands.” (63 Cal 2d, at 18, 403 P2d, at 151.) The dissent concluded — and this Court agreed — that plaintiff sought to recover damages for failure of the product to function properly when used for normal business purposes, which was at best a breach of contract, not a tort.
The Schiavone dissent discussed a second case, which explicitly adopted the Seely approach but allowed recovery for *292 injury to the product itself under a theory of product liability. In Dudley Constr. v Drott Mfg. Co. (66 AD2d 368 [Hancock, Jr., J.]), involving a crane with defective bolts, the court concluded that the manufacturer could be held liable for damage to the product resulting from an "accident” caused by the defective parts. As distinguished by Justice Silverman in Schiavone, plaintiff in Dudley was not trying to enforce the benefit of its bargain. Rather, a dangerously defective product was placed into the stream of commerce and caused injury— albeit to the product itself.
Since Schiavone, a third, more restrictive approach has been established by the United States Supreme Court, in East River S. S. Corp. v Transamerica Delaval (476 US 858, supra). East River involved defective turbines that had been installed in several supertankers. Damage resulting from those defects raised the issue "whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation.” (476 US, at 866.) The Court answered this question in the negative, holding that a manufacturer in a commercial relationship has no duty to prevent a product from injuring itself (476 US, at 872). Writing for a unanimous Supreme Court, Justice Blackmun expressly rejected the "intermediate” approach that would permit a tort action where users were "endangered” rather than merely "disappointed.” (476 US, at 869-870.)
Although an admiralty case not binding on us as a matter of State tort or contract law, the East River analysis has had significant influence (see, e.g., Nathaniel Shipping v General Elec. Co., 920 F2d 1256 [5th Cir]; Aloe Coal Co. v Clark Equip. Co., 816 F2d 110 [3d Cir], cert denied 484 US 853; Florida Power & Light Co. v Westinghouse Elec. Corp., 510 So 2d 899 [Fla]; Lloyd Wood Coal Co. v Clark Equip. Co., 543 So 2d 671 [Ala]). Courts choosing the East River analysis have stressed that tort law is an improper tool for resolving commercial disputes, and represents an unwarranted extension into an area reserved for contract law (see, Miller v United States Steel Corp., 902 F2d 573, 574 [7th Cir] [describing tort law as a "superfluous and inapt tool” for resolving commercial disputes]; O’Brien Cos. v Challenge-Cook Bros., 672 F Supp 466, 471 [D Colo] [citing the need to stem the "ceaseless march toward the merger of principles of tort and contract”]).
In addition, courts following East River have stressed that *293 the theory behind products liability — the idea that the individual consumer who purchases or uses a defective product capable of inflicting injury should not have to shoulder the economic loss — is inapplicable to disputes between commercial parties over a damaged product (see, Laurens Elec. Coop. v Altec Indus., 889 F2d 1323 [4th Cir], supra). In the case of this purely economic loss, there is no need to shift the loss to the manufacturer to be passed along to and shared by all consumers (see, Continental Ins. v Page Eng’g Co., 783 P2d 641, 647 [Wyo], supra). The East River approach rejects any application of tort law to these commercial disputes.
Not all State courts have adopted the East River analysis. Instead, courts in several jurisdictions have opted for the intermediate approach, finding that the certainty of the East River bright line rule "comes at too high a price.” (Washington Water Power Co. v Graybar Elec. Co., 112 Wash 2d 847, 864, 774 P2d 1199, 1209; Capitol Fuels v Clark Equip. Co., 382 SE2d 311 [Ct of App W Va].) The intermediate or "risk of harm” approach focuses on several factors, including the nature of the defect, type of risk, and manner in which the injury occurred (see, Pennsylvania Glass Sand Corp. v Caterpillar Tractor Co., 652 F2d 1165 [3d Cir]; and Consumers Power Co. v Curtiss-Wright Corp., 780 F2d 1093 [3d Cir] [both pre-East River]). The risk of harm analysis has been used, for example, by courts in holding asbestos manufacturers liable under tort-law principles for creating a substantial and unreasonable risk of harm (see, e.g., City of Greenville v Grace & Co., 827 F2d 975, 978 [4th Cir]; Adams-Arapahoe School Dist. No. 28 v Celotex Corp., 637 F Supp 1207 [D Colo]; cf., Board of Educ. v A, C & S, Inc., 131 Ill 2d 428, 546 NE2d 580 [rejecting intermediate approach but finding asbestos manufacturer liable for marketing an unreasonably dangerous product]).
In the present case, we find it unnecessary to accept or reject Masonite’s invitation to adopt East River as a matter of State law, for plaintiff’s tort claim fails even under the intermediate approach spelled out in Schiavone. The nature of the defect, the injury, the manner in which the injury occurred and the damages sought persuade us that plaintiff’s remedy lies in the enforcement of contract obligations, not the enlargement of strict products liability beyond its intended purposes.
Looking first to the nature of the defect, it is evident that what was involved in "intermediate approach” cases such as *294 Dudley and Pennsylvania Glass Sand is far different from what is at issue here. In those cases allowing tort recovery, the product was manufactured with an undiscovered hazard bound to produce a catastrophic accident or enhance the damages should such an accident occur. Here, no one has asserted that a floor tile with less than 100% adhesive coverage is such an inherently dangerous product. Unlike a crane with defective bolts, these floor tiles may be adequate for a number of uses, even if not the bargained-for use in plaintiffs apartment complex.[2]
The injury — delamination of the tile — was not personal injury or property damage, but solely injury to the product itself. The injury, moreover, was not an abrupt, cataclysmic occurrence, as in Dudley or Pennsylvania Glass Sand, but a process of failure of the product to perform as anticipated under normal business conditions — a traditional breach of contract situation. While there was indication that, over a dozen years, three residents of Phipps Plaza had fallen, plaintiff does not claim that it has been held responsible for any injuries to persons or property. Whether or not those accidents occurred, on this record plaintiffs injury and damages would be precisely the same — the cost of replacing the floor.
That this is simply a case of economic disappointment is brought home by plaintiffs statement that the "wood floor tiles should have lasted the life of the building, at least 40 to 50 years.” In this situation where the bargained-for consideration has failed to meet the expectations of the purchaser — as in Schiavone — the remedy lies in contract-law theories such as *295 express and implied warranties, through which a contracting party can recover the benefit of its bargain, not in a tort-law doctrine that strictly assigns the loss to a remote manufacturer to be shared by all its customers (see, Pennsylvania Glass Sand Corp. v Caterpillar Tractor Co., 652 F2d, at 1175, supra).
Plaintiff further argues that, as a matter of policy, strict liability is necessary because there would otherwise be no incentive to fix the defective floor, making it necessary for someone to suffer a severe injury before remedial action was taken. Even without tort liability, however, a purchaser in plaintiff’s circumstances has every incentive to seek a remedy for the breach of contract. Significantly, plaintiff itself stated that it sought replacement of the tile in relation to a proposed rent increase. Plaintiff would hardly forego legal action against the contractor or subcontractor because no recovery in strict liability was possible against the manufacturer. Commercial interests, together with the fear of liability for any injuries that might occur, are a powerful incentive for such plaintiffs, without the need to open another avenue of redress in the law of torts.
We hold, therefore, that plaintiff should not recover from Masonite in strict liability for failure of the tile to perform according to contract.
Circle’s Indemnity Claim Against Masonite
Although Masonite is not directly liable to plaintiff in strict products liability, the issue remains whether Circle might shift its liability to Masonite on the theory of implied warranty of merchantability (see, UCC 2-314).[3] We conclude that Circle’s indemnification claim on this theory should have been submitted to the jury.
Originally, Circle claimed over against Masonite for common-law indemnity based on two separate theories — Masonite’s active negligence in manufacturing the tile (its "negligence indemnity” claim), and breach of implied warranty (its "implied warranty indemnity” claim). The trial court dismissed plaintiff’s implied warranty claims against HRH and *296 Circle, concluding that those defendants supplied services, not goods. The court concomitantly dismissed Circle’s implied warranty indemnity claim against Masonite, believing that it could not stand once plaintiffs implied warranty claims had been dismissed. Circle’s negligence indemnity claim against Masonite was thus the only indemnity claim submitted to the jury, and it was rejected.
The right of one party to shift the entire loss to another— indemnification — may be based upon an express contract or an implied obligation, as is the case here. Implied indemnification claims, in turn, may rest on various independent grounds — for example, indemnity may be appropriate because of a separate duty owed the indemnitee by the indemnitor, or because one of two parties is considered actively negligent or the primary or principal wrongdoer (see, Mas v Two Bridges Assocs., 75 NY2d 680, 689-690; D’Ambrosio v City of New York, 55 NY2d 454, 461).
In the present case, the Uniform Commercial Code creates an implied warranty between Circle and Masonite, and Circle has grounded its indemnification claims in this legal relationship as well as Masonite’s active negligence in manufacturing and furnishing the floor tiles. Although the issue has never been directly addressed by this Court, courts in other jurisdictions have recognized that implied warranty may provide the requisite basis for an indemnification claim (see, e.g., Crest Container Corp. v Bishop Co., 111 Ill App 3d 1068, 445 NE2d 19, 23-25; see also, Walker Mfg. Co. v Dickerson, Inc., 619 F2d 305 [4th Cir]). It is the implied warranty theory — not concern over primary fault — that is determinative of such an indemnity claim, and that warranty must be examined on its own terms. ,
We first consider the trial court’s dismissal of Circle’s implied warranty indemnity claim against Masonite based on the contemporaneous dismissal of plaintiffs warranty claims, and conclude that Circle’s claim should not have been dismissed on that basis.
Unlike HRH and Circle, Masonite supplied goods, having delivered the floor tiles to Circle in August 1976. Masonite, as the seller, warranted to the buyer, Circle, that the goods were merchantable (see, UCC 2-314). While the trial court apparently believed that the warranty between buyer and seller could not be invoked if warranty liability was not being passed through the chain of distribution from the consumer *297 through the distributor to the manufacturer, no such chain of events has been required as a precondition to warranty liability on the part of the seller to the initial purchaser. The warranty claim formed an independent basis for liability, available to the indemnitee against the indemnitor regardless of the ability of the plaintiff to assert a similar claim (see, e.g., Matter of Feehan v United States Lines, 522 F Supp 811, 815-816 [SD NY]).
It is possible that a plaintiff’s theory of liability against the indemnitee would, as a matter of law, preclude recovery against the indemnitor (see, Mas v Two Bridges Assocs., 75 NY2d 680, 689-690, supra; see also, Codling v Paglia, 32 NY2d 330, 340, supra). In Mas, for example, the plaintiff, who had been injured while attempting to exit a disabled elevator, sued the owner of the building and Otis Elevator Company, the company that had contracted to maintain the elevator. The theories of liability asserted against the owner were failure to maintain and repair the elevator and failure to provide assistance. The jury apportioned 85% liability for failure to maintain and 10% liability for failure to respond. This Court upheld the owner’s judgment on its indemnity cross claim against Otis for 85% of the damages, even though the owner had been found 10% liable for failure to respond. Had the only cause of action been for failure to respond, no indemnity based on the contract for repair would, as a matter of law, have been available to the owner.
Here, however, the basis for the cause of action asserted against HRH and Circle was entirely consistent with Circle’s implied warranty indemnity claim against Masonite. Although falling under the general description of "breach of contract,” the liability of Circle and HRH rested on the defective product. Dismissal of plaintiff’s implied warranty claims should, therefore, have had no effect on Circle’s claim against the supplier, Masonite (see, State Univ. Constr. Fund v United Technology Corp., 78 AD2d 748; Matter of Feehan v United States Lines, 522 F Supp 811, 815-816, supra).
Nor was Circle’s implied warranty indemnity claim barred as a matter of law by its own conduct. The Appellate Division found that Circle’s relationship with Masonite, along with the fact that Masonite did not manufacture a comparable tile until Circle obtained the subcontract, acted to bar any claim based on implied warranty, and it denied Circle’s implied warranty indemnity claim because "Circle is not an *298 innocent party entitled to shift liability to Masonite.” (160 AD2d 189, 190.)
The "innocent party” language reveals the Appellate Division’s belief that Circle’s two separate indemnification theories share the same elements. A finding by the jury that Circle could not recover on the negligence theory thus would preclude recovery on the warranty theory. Indeed, the Appellate Division’s holding echoes the instruction given by the trial court on the indemnity claim:
"If you determine that. [Masonite] is primarily responsible for the damages sustained by plaintiff and that causing the defendant Circle to pay damages to the plaintiff would result in the unjust enrichment of the defendant [Masonite], then you must return a verdict in favor of the defendant Circle on its cross-claim against the defendant [Masonite].”
The elements of a negligence indemnity claim, however, are not necessarily relevant to an implied warranty indemnity claim.
As discussed above, Masonite — as the seller of the tiles — is deemed to have made an implied warranty as to their merchantability (UCC 2-314). To recover implied warranty indemnity, Circle must show both the existence and breach of the warranty and that the breach was the proximate cause of plaintiff’s damages (see, UCC 2-314, Official Comment 13; see generally, 1 White & Summers, Uniform Commercial Code § 9-9 [Practitioner’s 3d ed]).
Defenses available to claims of breach of the implied warranty of merchantability include the buyer’s contributory conduct, lack of privity, failure to give notice, and the Statute of Limitations[4] (see generally, Special Project, Article Two Warranties in Commercial Transactions, 64 Cornell L Rev 30, 243 [1978]). Under the first of these defenses — the buyer’s conduct — the focus is on "factors that may sufficiently attenuate the causal connection between defendant’s acts and plaintiff’s injury to bar recovery.” (1 White & Summers, Uniform *299 Commercial Code § 11-8, at 541 [Practitioner’s 3d ed].) For purposes of this claim the analysis of Circle’s conduct thus must be made from the perspective of causation rather than from the perspective charged by the trial court, which was one of primary responsibility and unjust enrichment.
Therefore, the jury’s rejection of the indemnity claim that was submitted to it — rendered in response to the trial court’s instructions on principles of primary responsibility and unjust enrichment — is not the final word on Circle’s indemnity claim based on the implied warranty. Rather, it must be determined whether Circle has a meritorious implied warranty indemnity claim against Masonite and whether Masonite has any valid defenses to that claim. In that the trial court erroneously dismissed this indemnity claim, Circle’s request for a new trial should be granted.
Accordingly, on Masonite’s appeal, the order of the Appellate Division should be reversed, with costs, and plaintiffs products liability claim dismissed.[5] On Circle’s appeal, the order of the Appellate Division should be modified, with costs to Circle as against Masonite, by granting Circle a new trial on its implied warranty indemnity claim against Masonite and, as so modified, affirmed, with costs to plaintiff as against defendant Circle.

. New Jersey itself has stepped away from Santor, more recently holding that a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover under a warranty theory but not in strict liability (Spring Motors Distribs. v Ford Motor Co., 98 NJ 555, 489 A2d 660).

. The dissent rests entirely on the tile’s "dangerousness” — that it was hazardous to life and limb, that the safety risk was well documented, that there was an affirmed finding to this effect. In fact, during the 12 or more years the tile had been in use in plaintiff’s 894 apartments, there was a total of one documented injury and two reported slip-and-fall incidents. As for the "affirmed finding,” under the intermediate approach, the determination whether a tort claim is stated is one that must be made in the first instance by the court, applying factors such as the nature of the defect, type of risk, and manner in which the injury occurred. The jury in the present case of course had no opportunity or occasion to weigh those factors, and its finding on an issue that should have been resolved as a threshold law question in no way limits our review.
The dissent’s distinguishing test, moreover — that liability should be allowed where the recovery sought is the cost of eliminating the hazard or making the product safe (dissenting opn, at 304) — is no distinction at all. Whether a defective piece of equipment such as a truck hoist, or floor tiles, or virtually any other product, recovery of replacement costs always can be said to be sought for eliminating the hazard or making the product safe.

. Circle’s claim that it should be wholly absolved for liability to plaintiff —because plaintiffs architect approved the substitution — requires little discussion. The jury’s rejection of Circle’s contention that this was more than design approval is amply supported by the record (see also, 160 AD2d, at 190).

. Masonite claims that the four-year limitations period — measured from delivery of the goods — expired prior to commencement of this action (see, UCC 2-725 [2]). It is clear, however, that Circle’s quasi-contractual indemnity claim is governed by the six-year contract Statute of Limitations. Moreover, such a claim accrues upon payment by the party seeking indemnity (see, McDermott v City of New York, 50 NY2d 211, 217).

. [4] Plaintiff asks that the verdict against Masonite be affirmed on an alternative ground — either Masonite’s breach of implied warranty, or that Masonite should have been held jointly and severally liable to plaintiff for the total amount found against all three defendants. The trial court dismissed plaintiffs implied warranty claim against Masonite, and refused plaintiffs requests for a judgment in the total amount against each defendant jointly and severally. Thus, plaintiffs present requests, which if meritorious would require reversal of the trial court’s rulings and a new trial, go beyond affirmance of the judgment and cannot be awarded to a nonappealing party (see, Parochial Bus Sys. v Board of Educ., 60 NY2d 539, 545-546; Hecht v City of New York, 60 NY2d 57).