[863 NYS2d 737]

Susan Jesmer, Doing Business as First Americans Food Stores, Appellant, v Retail Magic, Inc., et al., Defendants, and Auto-Star Compusystems, Inc., Respondent.

Second Department, September 9, 2008

## APPEARANCES OF COUNSEL

*Jeffrey B. Hulse*, Hauppauge, for appellant.

*Kaufman Borgeest & Ryan, LLP*, New York City (*Jonathan B. Bruno* of counsel), for respondent.

## OPINION OF THE COURT

DICKERSON, J.

On this appeal, we are asked to consider whether a dissatisfied end user of a computer system may maintain a cause of action against the system's manufacturer sounding in breach of contract where the end user did not purchase the system from the manufacturer, but from an authorized dealer. We also consider whether, in the absence of privity between the end user and the manufacturer, the end user may nonetheless maintain a cause of action against the manufacturer to recover damages for breach of implied warranties, or breach of express warranties contained in the manufacturer's brochure, a written price quote, an on-line digital licensing agreement, and a seller's distribution agreement. We hold that, in the absence of privity, the end user has no cause of action against the manufacturer sounding in breach of contract or breach of implied warranty. We conclude, however, that the end user has a cause of action against the manufacturer to recover damages for breach of express warranties contained in the brochure, the price quote, and the seller's distribution agreement. Since the end user here did not personally accept, agree to, or rely upon the terms of the on-line digital licensing agreement, she has no cause of action against the manufacturer to recover damages for breach of the express warranties contained therein. For the same reason, the manufacturer may not invoke the provisions of the digital licensing agreement to limit or restrict the express warranties contained in the brochure, the price quote, or the seller's distribution agreement.

## The Point of Sale System

The plaintiff, Susan Jesmer, doing business as First Americans Food Stores (hereinafter Jesmer), owns and operates a grocery

store, affiliated with the IGA supermarket chain, known as First Americans IGA (hereinafter First Americans), in Hogansburg, New York, near the Canadian border. In 2004 First Americans decided to upgrade its cash registers and accounting system by purchasing a "state of the art" point of sale (hereinafter POS) system. In that regard, First Americans retained the services of a POS consultant, Bozzuto's, Inc. (hereinafter Bozzuto's), whose principal place of business is in Cheshire, Connecticut. Bozzuto's introduced several POS system vendors to First American, including a team comprised of the defendant Auto-Star Compusystems, Inc. (hereinafter Auto-Star), a developer of POS systems and retail management software for grocery stores, with its principal offices located in Medicine Hat, Alberta, Canada, and the defendant Retail Magic, Inc. (hereinafter Magic), an authorized Auto-Star distributor, whose principal office is located in Mineola.

### The Presentation

According to First Americans' manager, Todd LaVigne, an Auto-Star vice-president named Michele, and Magic's principal, Jesse Lamba, met with him and made a presentation "to show us how their product would streamline and modernize our store." LaVigne "explained to [Auto-Star and Magic] all of our needs, including the requirement that the system handle multiple currencies as a result of our location [in] upstate New York, near Canada. They assured us that they could adapt the system to handle all of our requirements."

### The Brochure

During the presentation, representatives of First Americans were given and read a brochure entitled "Auto-Star Seamless POS Abilities," which stated, inter alia, that Auto-Star software "is customizable to any retailer's needs" and "provides retailers with the tools that they require to reduce costs, increase efficiency, and maintain customer service satisfaction." The brochure further recited that "Auto-Star's software applications can be found in thousands of retail stores," and set forth a partial list of Auto-Star's customers. The brochure went on to state that Auto-Star "provide(s) on site trainers to lead or assist in initial installations," that Auto-Star's "knowledgeable support desk is available to help you 24 hours a day, 7 days a week and our project managers are always available to address your needs," and that Auto-Star has a "dedicated team eager to meet

the task of working with your company and go beyond ordinary retail management requirements to provide a product that meets your unique requirements."

## The Price Quote

On or about May 9, 2005, Auto-Star and Magic prepared a "Quote For Software, Equipment, Installation, Training & Support" for First Americans (hereinafter the Quote) which described in great detail the steps they would take in connection with the creation, delivery, and installation of a POS system comprised of a "backend" system ("Server & Workstations Total $41,988.20"), a "lanes" system ("Wired lane, Wireless Lane, RF Total $173,275.40"), and support ("Misc Costs, Support, Extended Installation & Business Setup Support Total $29,976.17"), for a "Total Extended Price" of $245,239.77, of which the sum of $230,000 was eventually paid by First Americans before the Auto-Star POS system was rejected as inoperable.

## The Problems

In June 2005 Auto-Star's POS system was installed at First Americans. According to the complaint, the POS system never functioned properly and was never fully operational. Specifically, the complaint alleged that the POS system was deficient in that it

"(a) Produced erroneous cash, credit & debit sales at registers and customer service;

"(b) Produced sales at registers which were closed and which were not being operated;

"(c) Produced different 'senior discounts' at different registers;

"(d) Caused alcohol and tobacco sales [to] ring up differently between registers;

"(e) Caused registers to erroneously report errors of large amounts of cash;

"(f) Failed to finalize sales causing system and accounting errors;

"(g) Validated checks and yet failed to finalize the sale;

"(h) Caused system freezes/lock-ups during credit/debit authorizations;

"(i) Failed to be set up for dual currency, causing irate customers to go to customer services in order to make exchanges;

"(j) Caused PC crashes regularly, averaging 5-10 times per day;

"(k) When entering cashier totals in cash management, the system often took hours to catch up. Some entries did not show up in the system until the following day."

### Demands To Cure Default

First Americans made oral and written demands upon Auto-Star and Magic "to cure the defaults and provide us with a functional system." According to First Americans, "[t]hey never cured." Although First Americans alleged that representatives of Auto-Star "resolved a few of our complaints," it asserted that the POS system was never fully operational and that it formally rejected the POS system "as a result of serious defects which render the system of no value." Auto-Star's POS system was removed from the First Americans grocery store, replaced by an IBM POS system. First Americans thereafter stored the Auto-Star POS system, purportedly on behalf of Auto-Star and Magic.

### The Action

On February 2, 2006, Jesmer commenced this action against Auto-Star and Magic, alleging that First Americans had entered into a contract with them, whereby they agreed to design and install a fully-integrated, fully-functional POS system in the First Americans store, including support for store setup, initial operation, and annual support for a total price of $245,239.77. Jesmer alleged that the defendants installed the POS system in June 2005, and that she paid the defendants a total sum of $230,000, but that the POS system failed to perform properly from the outset of its installation.

Jesmer alleged in her complaint that the installation of the defendants' POS system "rendered Plaintiff unable to conduct her business thereby resulting [in] the loss of sales and customers." The first cause of action seeks rescission of the contract and the return of the sum of $230,000 Jesmer paid to the defendants. The second, third, and fourth causes of action al-

lege breach of express warranties (UCC 2-313) and breach of implied warranties (UCC 2-314), breach of warranty of fitness for a particular purpose, and breach of contract, respectively, and demand damages in the sum of $1,000,000.

## The Motion To Dismiss

Auto-Star moved pursuant to CPLR 3211 (a) (1) and (7) to dismiss the complaint insofar as asserted against it. First, Auto-Star asserted that documentary evidence conclusively established that there was never any contract between Auto-Star and First Americans, that Magic was never Auto-Star's agent, that there is no evidence to support a finding of apparent authority, and that First Americans was not in privity with Auto-Star. Hence, Auto-Star argued that the first and fourth causes of action, based upon a breach of contract, should have been dismissed.

Second, Auto-Star contended that the second and third causes of action, based upon breach of warranty, should have been dismissed since Magic was First Americans' agent, and Auto-Star disclaimed all such warranties (*see* UCC 2-316) in both a confidential quotation it provided to Magic regarding the POS system ultimately sold to First Americans and a Digital License Agreement (hereinafter DLA) which appeared on a computer screen on Magic's computer prior to installation of the POS system. In opposition to Auto-Star's motion, First Americans' manager LaVigne averred, in an affidavit, that Magic was not First Americans' agent, but rather was Auto-Star's agent. Moreover, LaVigne asserted that no one affiliated with First Americans was privy to either disclaimer, and that First Americans could thus not be bound by them.

## The Relationships Between The Parties

In light of the sharp disagreement between the parties as to whether an agency relationship existed between Magic and either First Americans or Auto-Star, the manner in which Auto-Star did business must be considered. Based on the record before us, and regardless of the parties' characterization of Magic's role, we find that it was not an agent of either First Americans or Auto-Star.

According to Auto-Star's president Robert Symmonds, Auto-Star sells its POS systems to master distributors, who then sell the related software to authorized distributors/resellers, such as Magic, who in turn sell the software to an end user such as

First Americans. The master distributors are not involved in the installation of the software, but distributors/resellers may install the software and assemble components from many manufacturers in order to install those components in the POS system.

## The Software Distribution Agreement

The relationship between Auto-Star, Magic, and First Americans is further defined by the Software Distribution Agreement (hereinafter the SDA) between Auto-Star and Magic, which provides, inter alia:

"2. Appointment and Grant of License

"(a) Appointment. Pursuant to the terms and conditions of this Agreement, during the term hereof, [Auto-Star] hereby grants to [Magic]. . . the non-exclusive and non-transferable license to market and demonstrate the Product for potential Customers within the Territory and sublicense, install, and support the Products for Customers within the Territory. . . .

"10. Developer's Warranty of Products and Support Obligations

"(a) [Auto-Star] warrants that the Product for which [Magic] is required to provide First Line Support will perform in substantial conformity to the product description set forth in the Documentation that accompanies that Product, as it may exist from time to time. . . .

"17. Miscellaneous Provisions

"(a) Not a Joint Venture. Nothing contained in this Agreement shall be deemed or construed as creating a joint venture or partnership between [Auto-Star] and [Magic]. [Auto-Star] and [Magic] shall have no power to control the activities and operations of the other and their status is, and at all times will continue to be, that of independent contractor with respect to each other. Neither party shall have any power or authority to bind or commit the other."

Moreover, according to Symmonds, Auto-Star "was not involved in the installation of the POS System in [First Americans' store]. Rather, Auto-Star's involvement in this case

was limited to supplying the software to [distributors] BlueStar and Retail Magic and providing Retail Magic . . . with 'second line support,' " as defined in the SDA. Symmonds also stated that the plaintiff "purchased all hardware and software directly from Retail Magic. Auto-Star billed either BlueStar or Retail Magic directly for its software (and) never invoiced or accepted payment [from First Americans and] never entered into a contract with [First Americans]."

## The Confidential Quotation

In addition, included among the invoices sent by Auto-Star to Magic and BlueStar was a "Confidential Quotation" from Auto-Star to Magic regarding custom development work for two dual currency cash drawers. The "Confidential Quotation" contains the following disclaimers:

> "The warranties provided for herein are in lieu of all other warranties or conditions, express or implied, including but not limited to the implied representations, warranties and conditions of quality, performance, title, merchantability or merchantable quality, fitness for a particular purpose, durability, and infringement and those arising by statute or otherwise in law or from the course of dealing or usage of trade. Neither [Auto-Star] nor any applicable third party licensor represents or warrants that the licensed material will meet any or all of the licensee's particular requirements, that the software will perform to licensee's performance standards, that the operation of the software will be error-free or uninterrupted, that the results obtained from its use will be accurate or reliable, or that all programming errors can be corrected or found in order to be corrected."

## The Digital License Agreement

In his affidavit, Symmonds also stated that, before Auto-Star's software can be installed on an end user's computer, the user must read a standard DLA and click a box stating "I accept the terms in the licensing agreement." The DLA contains, inter alia, a 90-day warranty, which provided, in relevant part, that Auto-Star "warrants that the SOFTWARE operates in all material respects in accordance with any related documentation," and provided that "the SOFTWARE is being used on the equip-

ment on which it was installed and the LICENSEE has not made any enhancement or modifications." Moreover, the DLA contains a disclaimer, which recites:

"THE WARRANTIES PROVIDED FOR HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED REPRESENTATIONS, WARRANTIES OR CONDITIONS OF QUALITY, PERFORMANCE, TITLE, MERCHANTABILITY, MERCHANTABLE QUALITY, FITNESS FOR A PARTICULAR PURPOSE, DURABILITY, INFRINGEMENT AND THOSE ARISING BY STATUTE OR OTHERWISE IN LAW OR FROM THE COURSE OF DEALING OR USAGE OF TRADE. [AUTO-STAR] DOES NOT REPRESENT OR WARRANT THAT THE LICENSED MATERIAL WILL MEET ANY OR ALL OF THE LICENSEE'S PARTICULAR REQUIREMENTS, THAT THE SOFTWARE WILL PERFORM TO LICENSEE'S PERFORMANCE STANDARDS, THAT THE OPERATION OF THE SOFTWARE WILL BE ERROR-FREE OR UNINTERRUPTED, THAT THE RESULTS OBTAINED FROM ITS USE WILL BE ACCURATE OR RELIABLE, OR THAT ALL PROGRAMMING ERRORS CAN BE CORRECTED OR FOUND IN ORDER TO BE CORRECTED."

### The Order Appealed From

In an order dated March 15, 2007, the Supreme Court, inter alia, granted Auto-Star's motion to dismiss the complaint insofar as asserted against it. For the reasons set forth below, we modify the order of the Supreme Court by, among other things, denying those branches of Auto-Star's motion which were to dismiss the second and third causes of action alleging breach of certain express warranties insofar as asserted against it.

### Analysis

A CPLR 3211 (a) (1) motion "may be appropriately granted only where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (*Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 326 [2002]). Stated another way, " '[t]o succeed on a motion to

dismiss pursuant to CPLR 3211 (a) (1), the documentary evidence that forms the basis of the defense must be such that it resolves all factual issues as a matter of law, and conclusively disposes of the plaintiff's claim' " (*M. Fund, Inc. v Carter*, 31 AD3d 620, 621 [2006], quoting *Trade Source v Westchester Wood Works*, 290 AD2d 437, 438 [2002]; *see Topel v Reliastar Life Ins. Co. of N.Y.*, 6 AD3d 608 [2004]; *Berardino v Ochlan*, 2 AD3d 556, 557 [2003]). With respect to the alternative ground for dismissal urged by Auto-Star,

> "[o]n a motion to dismiss pursuant to CPLR 3211 (a) (7), the court must accept the allegations of the complaint as true and accord the plaintiff the benefit of every possible favorable inference arising therefrom in determining whether the allegations fit within any cognizable legal theory. However, bare legal conclusions and factual claims which are flatly contradicted by the evidence are not presumed to be true on a motion to dismiss for failure to state a cause of action. Further, when the moving party offers evidentiary material, the court is required to determine whether the proponent of the pleading has a cause of action, not just whether he or she has stated one" (*Pincus v Wells*, 35 AD3d 569, 570 [2006] [citations omitted]).

■■■ Applying these standards, Jesmer has a viable cause of action against Auto-Star based on breach of the express warranties contained in Auto-Star's brochure, the Quote, and the SDA. Since we conclude that Magic was not Jesmer's agent, the warranty limitations and disclaimer contained in the DLA, which were accepted by Magic but not by Jesmer, are not binding upon her. Since we conclude that Magic was also not Auto-Star's agent, however, Jesmer does not have a viable cause of action based on breach of implied warranties.

■ The SDA clearly demonstrates that Magic was Auto-Star's distributor (*see Lomax v Henry*, 119 AD2d 638, 639 [1986]). "However, the record is devoid of evidence that [Auto-Star] retained or exerted any control over the manner in which distribution was conducted by [Magic] . . . [T]here is no legal basis to find [Magic] to have been functioning as [an] agent[ ] rather than [an] independent contractor[ ] of [Auto-Star]" (*id.*; *see Terrano v Fine*, 17 AD3d 449 [2005]; *Tobacco v North Babylon Fire Dept.*, 251 AD2d 398, 399 [1998]; *Price v Cities Serv. Oil Co.*, 71 AD2d 700, 701 [1979]).

First Americans contends that an apparent agency was created by the conduct of Auto-Star and Magic. We disagree. As the Court of Appeals explained in *Hallock v State of New York* (64 NY2d 224, 231 [1984]):

> "Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority. Rather, the existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal— not the agent. Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable" (citations and some internal quotation marks omitted).

LaVigne averred, in his affidavit, that Jesmer's consultant, Bozzuto's, "brought us several candidates to provide us with a new point of sale system." LaVigne asserted that "[n]either Retail Magic, nor Autostar [*sic*], ever told us that Autostar [*sic*] did not intend to be contractually responsible for the point of sale system they took great pains to demonstrate to us so that we would buy their product." The conduct described by La-Vigne, however, was not conduct by Auto-Star that would misleadingly suggest that Magic was its agent. If there was misleading conduct, it was on the part of Bozzuto's in introducing Magic as a "representative" of Auto-Star. The only other conduct described by the plaintiff is the inclusion, in Auto-Star's brochure, of statements that it has "customers" throughout the country that use its product. Such language does not, however, contain the slightest suggestion that anyone who sells Auto-Star software is an agent of Auto-Star or that anyone who uses the software has a contractual relationship with Auto-Star.

## Absence Of Contractual Relationship

Accordingly, Auto-Star conclusively established that First Americans' purchase of the POS system from Magic did not create a contractual relationship between First Americans and Auto-Star. Consequently, the Supreme Court properly granted those branches of Auto-Star's motion which were to dismiss the

first cause of action for rescission of the purchase agreement and the fourth cause of action to recover damages for breach of contract, insofar as asserted against Auto-Star.

Conversely, so much of the second and third causes of action as alleged that Auto-Star breached certain express warranties remain viable. Nonetheless, the express warranties contained in the DLA are unenforceable.

### The DLA Is Not Enforceable

■ Generally, DLAs* are enforceable under appropriate circumstances (*see Moore v Microsoft Corp.*, 293 AD2d 587 [2002]). As we noted in *Moore v Microsoft Corp.* (*id.*),

> "[t]he terms of the EULA [end-user license agreement] were prominently displayed on the program user's computer screen before the software could be installed. Moreover, the program's user was required to indicate assent to the EULA by clicking on the 'I agree' icon before proceeding with the download of the software. Thus, the defendant offered a contract that the plaintiff accepted by using the software after having an opportunity to read the license at leisure. As a result, the plaintiff's claims are barred by the clear disclaimers, waivers of liability and limitations of remedies contained in the EULA."

Similarly, in *Scott v Bell Atl. Corp.* (282 AD2d 180, 185 [2001], *mod* 98 NY2d 314 [2002]), we held that a breach of warranty claim based on representations made on the Web site of the defendant Internet service provider, to the effect that "[y]ou're always connected," should have been dismissed where the subscriber was required to agree to a service agreement before Internet service could commence, and the service agreement expressly disclaimed warranties of error-free service and provided that the service was provided on an "as is" or "as available" basis.

---

\* *See generally* Norwood, *A Summary Of Statutory And Case Law Associated With Contracting in the Electronic Universe,* 4 DePaul Bus & Com LJ 415, 415 (2006) ("Contracting in the electronic universe, practically nonexistent ten years ago, is now common practice"); Oakley, *Fairness in Electronic Contracting: Minimum Standards for Non-Negotiated Contracts,* 42 Hous L Rev 1041, 1041 (2005) ("Despite much discussion and controversy in the years since [*ProCD, Inc. v Zeidenberg*, 86 F3d 1447 (7th Cir 1996)] was decided, there has been an increasing use and acceptance of shrinkwrap, clickwrap, and browsewrap contracts and licenses as a means of conducting modern-day commerce").

Nonetheless, the DLA is not enforceable here because Jesmer did not have the opportunity to read or assent to it. Although the fact that Jesmer did not actually read the DLA is not necessarily dispositive (*see Brower v Gateway 2000*, 246 AD2d 246, 252 [1998]), an end user must be given the opportunity to view the DLA (*see Moore v Microsoft Corp.*, 293 AD2d at 587), a circumstance which was not established here. The DLA never appeared on First Americans' computer screens either before or after Auto-Star's POS system was installed. First Americans never expressly agreed to the DLA, never authorized Magic to agree to the DLA on its behalf (*cf. Hofer v Gap, Inc.*, 516 F Supp 2d 161, 174-175 [2007] [where the plaintiff authorized her travel companion to make travel arrangements online and to click through Expedia's Web site terms, conditions, and notices, which included a liability disclaimer, the plaintiff would be bound by the disclaimer]), and did not know of its existence until raised by Auto-Star in this action (*see Specht v Netscape Communications Corp.*, 306 F3d 17, 20 [2002]).

Critically, there is simply no evidence that Magic was First Americans' agent for any purpose (*see Enquire Print. & Publ. Co. v Vantage Graphics*, 245 AD2d 259, 260 [1997]; *Lomax v Henry*, 119 AD2d 638 [1986]; *cf. Ahl v Martin*, 82 AD2d 938 [1981]).

<u>Express and Implied Warranties</u>

The record reveals that Auto-Star's POS system was never completely installed at the First Americans store, and thus never operated properly. Accordingly, the 90-day time limitation on the express warranty of operability, as set forth in the DLA, never commenced and, hence, Auto-Star is bound by the broad express warranties set forth in its brochure, the SDA, the Quote, and other "related documentation."

Regardless of whether an agency relationship existed between First Americans and Magic, the DLA's limitations and disclaimers do not supersede any express warranties which Auto-Star made to First Americans in its brochure, particularly those promising performance over an extended period of time (*see Imperia v Marvin Windows of N.Y.*, 297 AD2d 621, 623-624 [2002]). As we have explained, "[a]n express warranty can arise from the literature published about a product . . . Such a warranty would not be barred by the general disclaimers of warranty that accompanied the sale of the products" (*id.*; *see Wiltshire v Robins Co.*, 88 AD2d 1097 [1982]). Moreover, "the very nature

of the product implies performance over an extended period of time" (*Mittasch v Seal Lock Burial Vault*, 42 AD2d 573, 574 [1973]). The following promises in Auto-Star's brochure are express warranties of future performance: the POS system "is customizable to any retailer's needs," and "provides retailers with the tools that they require to reduce costs, increase efficiency, and maintain customer service satisfaction," Auto-Star's "knowledgeable support desk is available to help you 24 hours a day, 7 days a week and our project managers are always available to address your needs," and Auto-Star has a "dedicated team eager to meet the task of working with your company and go beyond ordinary retail management requirements to provide a product that meets your unique requirements."

In addition, the general disclaimers in the DLA do not, in any event, apply to defeat the specific promises of "Support" and "Extended Installation" services which Auto-Star agreed to provide to First Americans (*see Norwest Fin. Leasing v Parish of St. Augustine*, 251 AD2d 125 [1998]).

The complaint alleges that the POS system manufactured by Auto-Star failed to function from the outset of its installation in June 2005. In particular, the complaint alleges that the POS system, inter alia, produced accounting errors and failed to "be set up" for dual currency, which was identified as a specific requirement by First Americans, whose facility is located near the Canadian border. In his affidavit, LaVigne stated that, although Auto-Star resolved a few complaints, it did not cure all of the defaults, requiring First Americans to replace the system with a new one installed by IBM. Jesmer sufficiently stated, for the purpose of a motion to dismiss, that Auto-Star breached the express warranties set forth in the brochure, the Quote, and the SDA.

The Supreme Court thus improperly granted those branches of Auto-Star's motion which were to dismiss the third cause of action to recover damages for breach of an express warranty that the POS system was fit for First Americans' particular use, and so much of the second cause of action as was to recover damages for breach of express warranties set forth in the brochure, the Quote, and the SDA.

■ However, the Supreme Court properly granted that branch of Auto-Star's motion which was to dismiss so much of the second cause of action as alleged breaches of implied warranties. Jesmer seeks recovery of economic loss only. Accordingly, since Jesmer is not in privity with Auto-Star, or in a relation-

ship approaching privity, she may not, as an end user of the POS system, recover her economic losses from the manufacturer under a theory of implied warranty (*see Bocre Leasing Corp. v General Motors Corp. [Allison Gas Turbine Div.]*, 84 NY2d 685 [1995]; *Bellevue S. Assoc. v HRH Constr. Corp.*, 78 NY2d 282, 293-295 [1991]; *Catalano v Heraeus Kulzer, Inc.*, 305 AD2d 356, 357-358 [2003]).

Moreover, lack of privity may not be overlooked or overcome under the circumstances of this case, since the entity that was in privity with Auto-Star—the distributor Magic—was not the agent of either Jesmer or Auto-Star.

## Conclusion

Accordingly, the order of the Supreme Court must be modified, on the law, by deleting the provisions thereof granting those branches of Auto-Star's motion which were pursuant to CPLR 3211 (a) (1) and (7) to dismiss the third cause of action insofar as asserted against it and so much of the second cause of action as alleged breach of express warranties set forth in Auto-Star's brochure, the Quote, and the SDA insofar as asserted against it and substituting therefor provisions denying those branches of the motion; as so modified, the order must be affirmed insofar as appealed from.

MASTRO, J.P., RIVERA and BALKIN, JJ., concur.

Ordered that the order is modified, on the law, by deleting the provisions thereof granting those branches of the motion of the defendant Auto-Star Compusystems, Inc., which were pursuant to CPLR 3211 (a) (1) and (7) to dismiss the third cause of action insofar as asserted against it and so much of the second cause of action as alleged breach of express warranties set forth in the brochure of that defendant, the Quote, and the SDA insofar as asserted against it and substituting therefor provisions denying those branches of the motion; as so modified, the order is affirmed insofar as appealed from, without costs or disbursements.