# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 26
159 MP Corp., et al.,
     Appellants,
    v.
Redbridge Bedford, LLC,
     Respondent.

A. Joshua Ehrlich, for appellants.
Jonathan D. Lupkin, for respondent.

DiFIORE, Chief Judge:

In New York, agreements negotiated at arm's length by sophisticated, counseled parties are generally enforced according to their plain language pursuant to our strong public policy favoring freedom of contract. In this case, commercial tenants who

- 1 -

unambiguously agreed to waive the right to commence a declaratory judgment action as to the terms of their leases ask us to invalidate that waiver on the rationale that the waiver is void as against public policy. We agree with the courts below that, under the circumstances of this case, the waiver clause is enforceable, requiring dismissal of the complaint.

Plaintiffs 159 MP Corp. and 240 Bedford Ave Realty Holding Corp. executed two commercial leases with the predecessor-in-interest of defendant Redbridge Bedford LLC, the current owner of the subject building. Together, the twenty-year leases permit plaintiffs to occupy 13,000 square feet of property in Brooklyn to operate a Foodtown supermarket. Rents started at $341,628 per year and were to increase over the lifetime of the leases to $564,659.02, which included a ten-year option at escalating rents. While the lengthy and detailed leases contained a standard form, its terms were not accepted as boilerplate but rather contained numerous handwritten additions and deletions, initialed by the parties. Of particular relevance to this dispute, each lease also incorporated a 36-paragraph rider, which was also replete with handwritten additions and deletions. Paragraph 67(H) of the rider provides:

> "Tenant waives its right to bring a declaratory judgment action with respect to any provision of this Lease or with respect to any notice sent pursuant to the provisions of this Lease . . . [I]t is the intention of the parties hereto that their disputes be adjudicated via summary proceedings" (emphasis added).

In March 2014, defendant sent notices to plaintiffs alleging various defaults and stating that plaintiffs had fifteen days to cure the violations in order to avoid termination of the leases. Before the cure period expired, plaintiffs commenced this action by way of order to show cause in Supreme Court seeking, as relevant here, a declaratory judgment

that they were not in default. Plaintiffs also sought a <u>Yellowstone</u> injunction in order to prevent the owner from terminating the leases or commencing summary proceedings during the pendency of the declaratory judgment action. Defendant answered and cross-moved for summary judgment dismissing the complaint, arguing that the action and, thus, the request for <u>Yellowstone</u> relief were barred by the waiver clause in the leases.[1] In response, plaintiffs asserted, among other things,[2] that if interpreted in the manner urged by the owner, the waiver clause was unenforceable and that the waiver was premised on mutual mistake concerning the scope of summary proceedings.

Supreme Court denied plaintiffs' motion for a <u>Yellowstone</u> injunction, granted defendant's cross motion for summary judgment, and dismissed the action in its entirety. The court began by observing that, "absent some violation of law or transgression of strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it may appear to a third-party" (<u>159 MP Corp. v Redbridge Bedford LLC</u>, 2015 NY Slip Op 32817(U), at *3 [Sup Ct, Kings County 2015], citing <u>Rowe v Great Atlantic & Pacific Tea Co.</u>, 46 NY2d 62, 67-68 [1978]). Relying on the plain language of the contract, the court concluded plaintiffs clearly waived the right to

---

[1] Although defendant cited a portion of Paragraph 67(H) stating that commencement of a declaratory judgment action provided a separate basis for termination of the leases, it did not counterclaim seeking either a declaration that the leases terminated or eviction based on purported breach of this provision. Because that provision was not enforced in this case, we have no occasion to further address it.

[2] Plaintiffs also argued that the complaint pleaded a cognizable breach of contract claim that was not barred by the waiver clause. However, that argument is not presented in this Court.

bring a declaratory judgment action and, in enforcing the provision, referenced the fact that the waiver did not "prevent either side from performing the agreement or from recovering damages as a result of a breach or the parties' tortious conduct . . . [and did not] deny plaintiffs all legal redress in this instance [because i]f plaintiffs dispute that they are in breach of the leases, they may raise any defenses they may have in any . . . summary proceeding brought by defendant in Civil Court to evict them" (159 MP Corp., 2015 NY Slip Op 32817(U), at *3 [citations omitted]). The court also rejected plaintiffs' mutual mistake argument, noting that plaintiffs had neither alleged fraud nor claimed they had been unable to review the leases with counsel (id.).

The Appellate Division, with one Justice dissenting, affirmed, determining that the declaratory judgment waiver was enforceable and barred plaintiffs' claim (159 MP Corp. v Redbridge Bedford, LLC, 160 AD3d 176 [2d Dept 2018]). The court commented, in light of the strong public policy favoring freedom of contract, that parties may waive a wide range of rights, observing that the parties here are "sophisticated entities that negotiated at arm's length" and entered contracts that defined their obligations "with great apparent care and specificity" (id. at 187, 189). Like Supreme Court, the Appellate Division emphasized that the waiver clause did not leave plaintiffs without other available legal remedies, noting that plaintiffs retained the right to receive notices under the leases (and thus cure defaults), to seek damages for breach of contract and tort, and to defend themselves in summary proceedings (id. at 191). Moreover, the Appellate Division observed that plaintiffs will remain in possession of the property unless summary proceedings are commenced and, if vindicated in a summary proceeding, would remain

indefinitely until expiration of the leases (id. at 191-92). In contrast, if found to have been in default, plaintiffs would properly be evicted under the terms of the leases (id. at 192).

One Justice dissented, concluding that the waiver clause is void as against public policy and, thus, unenforceable (160 AD3d at 194 [Connolly, J., dissenting]). The dissent reasoned that declaratory relief serves the important societal function of providing certainty in contractual relationships and that the tenant's ability to litigate in summary proceedings commenced by the owner was not a sufficient substitute for the ability to commence a declaratory judgment action (id. at 203-206). The Appellate Division granted plaintiffs leave to appeal to this Court, certifying the question whether its order was properly made, and we now affirm.

We begin with the "familiar and eminently sensible proposition of law [] that, when parties set down their agreements in a clear, complete document, their writing should . . . be enforced according to its terms" (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004] [citation omitted]). As we noted in Vermont Teddy Bear, a seminal case involving a commercial lease, this rule has "special import in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated counseled business people negotiating at arms length" (id. [internal quotation marks and citation omitted]). The lease provision at the center of this dispute could not be clearer. In it, plaintiffs "waive[d] [the] right to bring a declaratory judgment action with respect to any provision of this Lease or with respect to any notice sent pursuant to the provisions of this Lease." Applying our well-settled contract interpretation principles, this unambiguous waiver clause reflects the

parties' intent that plaintiffs be precluded from commencing precisely the type of suit they initiated here and, as such, this action was foreclosed by the plain language of the leases. Plaintiffs nonetheless ask us to relieve them of the consequences of their bargain, contending that the waiver clause violates a public policy strong enough to warrant a departure from the bedrock principle of freedom of contract. We reject that argument.

Freedom of contract is a "deeply rooted" public policy of this state (New England Mut. Life Ins. Co. v Caruso, 73 NY2d 74, 81 [1989]) and a right of constitutional dimension (U.S. Const. art. I, § 10[1]). In keeping with New York's status as the preeminent commercial center in the United States, if not the world, our courts have long deemed the enforcement of commercial contracts according to the terms adopted by the parties to be a pillar of the common law. Thus, "[f]reedom of contract prevails in an arm's length transaction between sophisticated parties . . . , and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain" (Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co., 86 NY2d 685, 695 [1995]).[3] We have cautioned that, when a court invalidates a contractual provision, one party is deprived of the benefit of the bargain (see id.; Rowe, 46 NY2d at 67). By disfavoring judicial upending of the balance struck at the conclusion of the parties' negotiations, our public

---

[3] See also Bluebird Partners v First Fid. Bank, 94 NY2d 726, 739 (2000) (declining to enforce the contract on champerty grounds may "engender uncertainties in the free market system in connection with untold numbers of sophisticated business transactions—a not insignificant potentiality in the State that harbors the financial capital of the world"); J. Zeevi & Sons, Ltd. v Grindlays Bank (Uganda) Ltd., 37 NY2d 220, 227 (1975) ("In order to maintain [New York's] pre-eminent financial position, it is important that the justified expectations of the parties to the contract be protected").

policy in favor of freedom of contract both promotes certainty and predictability and respects the autonomy of commercial parties in ordering their own business arrangements.

Of course, the public policy favoring freedom of contract does not mandate that the language of an agreement be enforced in all circumstances. Contractual provisions entered unknowingly or under duress or coercion may not be enforced (see Matter of Abramovich v Board of Educ. of Cent. School Dist. No. 1 of Towns of Brookhaven & Smithtown, 46 NY2d 450, 455 [1979]; see also Austin Instrument v Loral Corp., 29 NY2d 124, 130 [1971]). The doctrine of unconscionability also protects against "unjust enforcement of onerous contractual terms which one party is able to impose [upon] the other because of a significant disparity in bargaining power" (Rowe, 46 NY2d at 68). Plaintiffs raised none of these defenses.

Here, plaintiffs assert that the declaratory judgment waiver is unenforceable because it is void as against public policy. Thus, plaintiffs' challenge is not predicated on the circumstances surrounding the making of this particular agreement, such as allegations of unequal bargaining power, coercive tactics or lack of counsel – claims pertinent to other well-established contract defenses. Rather, plaintiffs' contention is that the right to bring a declaratory judgment action is so central and critical to the public policy of this state that it cannot be waived by even the most well-counseled, knowledgeable or sophisticated commercial tenant. We are unpersuaded.

We have deemed a contractual provision to be unenforceable where the public policy in favor of freedom of contract is overridden by another weighty and countervailing

public policy (<u>Oppenheimer & Co.</u>, 86 NY2d at 695).[4]  But, because freedom of contract is itself a strong public policy interest in New York, we may void an agreement only after "balancing" the public interests favoring invalidation of a term chosen by the parties against those served by enforcement of the clause and concluding that the interests favoring invalidation are stronger (see <u>New England Mut. Life Ins. Co.</u>, 73 NY2d at 81).  Although we possess the power to set aside agreements on this basis, our "usual and most important function" is to enforce contracts rather than invalidate them "on the pretext of public policy," unless they "clearly . . . contravene public right or the public welfare" (<u>Miller v Continental Ins. Co.</u>, 40 NY2d 675, 679 [1976], quoting <u>Baltimore & Ohio Ry. Co. v Voight</u>, 176 US 498, 505 [1900]).

The fact that a contract term may be contrary to a policy reflected in the Constitution, a statute or a judicial decision does not render it unenforceable; "that a public interest is present does not erect an inviolable shield to waiver" (<u>Matter of American Broadcasting Cos., Inc. v Roberts</u>, 61 NY2d 244, 249 [1984]).  Indeed, we regularly uphold agreements waiving statutory or constitutional rights, indicating that we look for more than the impingement of a benefit provided by law before deeming a voluntary agreement void as against public policy (see <u>e.g.</u> <u>id.</u> [upholding waiver of Labor Law protections that serve the societal interest of preventing worker exhaustion]; <u>Abramovich</u>, 46 NY2d 450

---

[4] When we refer to public policy in this context, we mean "the law of the State, whether found in the Constitution, statutes or decisions of the courts" (<u>New England Mut. Life Ins. Co.</u>, 73 NY2d at 81).  It is not enough that the agreement appears unwise to outsiders (see <u>Rowe</u>, 46 NY2d at 68), or violates "personal notions of fairness" (<u>Welsbach Elec. Corp. v MasTec N. Am., Inc.</u>, 7 NY3d 624, 629 [2006]) or "[courts'] subjective view of what is sound policy" (<u>Matter of Walker</u>, 64 NY2d 354, 359 [1985]).

[upholding waiver by tenured teacher of the protections in Education Law § 3020-a];

Antinore v State of New York, 40 NY2d 921 [1976] [upholding waiver of due process

protections afforded by disciplinary hearings under Civil Service Law §§ 75 and 76]).

Many rights implicate societal interests and, yet, they have been determined to be waivable.

Only a limited group of public policy interests has been identified as sufficiently

fundamental to outweigh the public policy favoring freedom of contract.  In some

circumstances, the Legislature has identified the benefits or obligations recognized in

constitutional, statutory or decisional law that are so weighty and critical to the public

interest that they are nonwaivable.  For example, General Obligations Law § 5-321 states

that agreements exempting a lessor for liability resulting from its own negligence are "void

as against public policy" (see Great N. Ins. Co. v Interior Constr. Corp., 7 NY3d 412, 418

[2006]).  Likewise, Rent Stabilization Code § 2520.13 states that "[a]n agreement by the

tenant to waive the benefit of any provisions of the [Rent Stabilization Law] or this code

is void" (see Thornton v Baron, 5 NY3d 175, 179 [2005]).  The Legislature has similarly

deemed unenforceable agreements to extend the statute of limitations before accrual of a

claim by express statutory proscription in General Obligations Law § 17-103 ("[a] promise

to . . . extend . . . the statute of limitations has no effect" except where made after accrual

of a claim) (see John J. Kassner & Co. v City of New York, 46 NY2d 544, 552 [1979]).

There are other examples (see e.g. West-Fair Elec. Constr. v Aetna Cas. & Sur. Co., 87

NY2d 148, 156 [1995] [applying Lien Law § 34 classifying waivers of the right to file or

enforce certain liens "void as against public policy and wholly unenforceable"]; Symphony

Space v Pergola Props., 88 NY2d 466, 476 [1996] [applying New York's Rule against

Perpetuities statute EPTL 9-1.1, stating that "[n]o estate in property shall be valid unless it must vest, if at all, not later than twenty-one years after one or more lives in being at the creation of the estate and any period of gestation involved"]).  Where the Legislature has not expressly precluded waiver of a right or obligation, we have deemed that to be a significant factor militating against invalidation of a contract term on public policy grounds (see e.g. Ballentine v Koch, 89 NY2d 51, 59 [1996] [there is no "general prohibition preventing the creation of benefits for retired public employees that exist separately from the applicable pension or retirement system"]; Abramovich, 46 NY2d at 455 ["the statute contains no express provision preventing a teacher from waiving its benefits"]; Matter of Feinerman v Board of Coop. Educ. Servs. of Nassau County, 48 NY2d 491, 498 [1979] [the relevant statute "does not contain a provision which prevents a prospective teacher from knowingly and voluntarily waiving the three-year probationary period embodied therein"]; see generally Slayko v Security Mut. Ins. Co., 98 NY2d 289, 295 [2002]).

We have also classified as void agreements that involve illegal activity.[5]  We refused to permit a lender that charged usurious interest from recovering principal (see Szerdahelyi v Harris, 67 NY2d 42 [1986]) and refused to permit a lawyer not licensed in New York from collecting fees for work performed here (see Spivak v Sachs, 16 NY2d 163 [1965]).  Similarly, in Mount Vernon Trust Co. v Bergoff (272 NY 192 [1936]), we invalidated an

---

[5] "Decisions like these are not based on a search for the equitable outcome of a particular case, or on a calculation of which result will most contribute, in an immediate and practical way, to the enforcement of a particular statute or public policy" (Balbuena v IDR Realty LLC, 6 NY3d 338, 364–365 [2006]).  "Rather, they are based on the sound premise that courts show insufficient respect for themselves and for the law when they help a party to benefit from illegal activity" (id. at 365).

agreement on the public policy rationale that it was essentially fraudulent as to society. Addressing an agreement that a note made to a bank would be unenforceable against its maker, we explained that such "[a] fictitious note delivered to a bank, intended to become part of its apparent assets . . . is in itself a continuing falsehood calculated to deceive the public" and undermines the stability of banks, which is a matter of public concern reflected in the regulatory oversight systems for banking (id. at 196). No interest of this magnitude is implicated in this case.

Here, the declaratory judgment waiver is clear and unambiguous, was adopted by sophisticated parties negotiating at arm's length, and does not violate the type of public policy interest that would outweigh the strong public policy in favor of freedom of contract. Although plaintiffs argue otherwise, there is simply nothing in our contemporary statutory, constitutional, or decisional law indicating that the interest in access to declaratory judgment actions or, more generally, to a full suite of litigation options without limitation, is so weighty and fundamental that it cannot be waived by sophisticated, counseled parties in a commercial lease. CPLR 3001 enables Supreme Court to grant declaratory judgments in the context of justiciable controversies but in no way indicates that sophisticated parties may not voluntarily waive the right to seek such relief. A declaratory judgment is a useful tool for providing clarity as to parties' obligations and may, in some circumstances, enable parties to perform under a contract they might otherwise have breached. Access to declaratory relief benefits the parties as well as society in quieting disputes. However, a declaratory judgment is merely one form of relief available to litigants in enforcing a contract. In codifying the right to seek declaratory relief, the Legislature neither expressly

nor impliedly made access to such a claim nonwaivable with respect to any party, much less sophisticated commercial tenants.

Our case law discussing declaratory relief explains its benefits in stabilizing uncertainty in contractual relations but likewise expresses no concrete public policy so weighty that it would justify broadly restricting commercial entities from freely waiving in negotiations the ability to seek such relief (see e.g. James v Alderton Dock Yards, 256 NY 298, 305 [1931]).  To the contrary, this Court already held in Kalisch-Jarcho, Inc. v City of New York that a party can relinquish its right to commence a declaratory judgment action in favor of an alternative dispute resolution method (72 NY2d 727 [1988]).  There, the Court held that a declaratory judgment action filed by a construction contractor was barred by a contract provision requiring the contractor to use an administrative procedure to resolve mid-project disputes, postponing claims for additional compensation until project completion (id.).  The Court reached this conclusion despite recognizing the benefits of declaratory relief in "settling justiciable disputes as to contract rights and obligations" (id. at 731).

The availability of declaratory relief may indirectly encourage parties to freely contract at the outset, knowing that they can later obtain judicial clarification of their obligations at the moment a justiciable controversy arises.  However, a party who has chosen freely to waive the right to seek such relief could not have relied on any such expectation; that party may compensate for the waiver by demanding greater clarity in the construction of other contract terms so that the parties' respective rights and obligations are fully understood before they sign the agreement.  Regardless, a party may agree to such

a waiver during contract negotiations to obtain a valuable benefit, such as a rent concession or the inclusion of a cure period following a notice of default. Such considerations are for the parties to weigh in crafting a commercial agreement that meets their unique needs.

Critically, the waiver clause at issue here does not preclude access to the courts but leaves available other judicial avenues through which plaintiffs may adjudicate their rights under the leases. The waiver permits plaintiffs to raise defenses to allegations of default in summary proceedings in Civil Court, under Real Property Actions and Proceedings Law (RPAPL) article 7, and specifically states that "it is the intention of the parties that their disputes be adjudicated via summary proceedings." As this Court has observed, RPAPL article 7 "represents the Legislature's attempt to balance the rights of landlords and tenants to provide for expeditious and fair procedures for the determination of disputes involving the possession of real property" (Matter of Mennella v Lopez-Torres, 91 NY2d 474, 478 [1998] [citations omitted]). Thus, the leases reflect the parties' general intent to resolve their disputes in proceedings carefully designed for that purpose. Moreover, the waiver does not impair plaintiffs' ability to seek damages on breach of contract or tort theories.

Indeed, despite the waiver clause, the judicial review available to plaintiffs is more generous than that available to parties whose contracts contain arbitration clauses – yet we routinely enforce arbitration clauses (see e.g. Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am., 37 NY2d 91, 95 [1975]). Such clauses preclude plenary litigation of disputes in court; when an award is made, typically the sole avenue for judicial review is a summary proceeding under CPLR article 75. Courts may set aside an arbitration award only if "it violates a strong public policy, is irrational, or clearly exceeds a

specifically enumerated limitation on the arbitrator's power" and may not "interpret the substantive conditions of the contract or . . . determine the merits of the dispute . . . even where the apparent, or even the plain, meaning of the words of the contract [was] disregarded" by the arbitrator (Matter of United Fedn. of Teachers, Local 2, AFT, AFL-CIO v Bd. of Educ. of City School Dist. of City of New York, 1 NY3d 72, 79, 82-83 [2003] [internal quotation marks and citations omitted]).  An arbitration clause – providing no access to court for initial litigation of the merits and limited judicial review – is more restrictive than the declaratory judgment waiver here, which permits judicial resolution of the parties' dispute in a RPAPL article 7 proceeding with full appellate review.

Although they significantly limit access to court, arbitration clauses provide "an effective and expeditious means of resolving disputes between willing parties desirous of avoiding the expense and delay frequently attendant to the judicial process" (Maross Constr. v Central N.Y. Regional Transp. Auth., 66 NY2d 341, 345 [1985] [citations omitted]).  "It has long been the policy of the law to interfere as little as possible with the freedom of consenting parties to achieve that objective" (Matter of Siegel [Lewis], 40 NY2d 687, 689 [1976]).  That policy applies with equal force here where the parties selected a summary proceeding as the primary vehicle for resolution of their disputes.  That we permit parties to waive the right to substantive review of their disputes in court by entering arbitration arrangements supports the conclusion we reach here: that there is no overriding public policy preventing sophisticated entities from waiving the right to commence a declaratory judgment action, which presents merely one tool for litigating a dispute.

Nor was this declaratory judgment waiver rendered unenforceable because, under the circumstances presented here, it resulted in an inability to obtain Yellowstone relief. We have described the Yellowstone injunction as a "creative remedy" crafted by the lower courts to extend the notice and cure period for commercial tenants faced with lease termination (Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d 508, 514 [1999]).  In the wake of First Natl. Stores v Yellowstone Shopping Ctr. (21 NY2d 630 [1968]), tenants challenging notices of default in declaratory judgment actions "developed the practice of obtaining a stay of the cure period before it expired to preserve the lease until the merits of the dispute could be settled in court," and courts have "accepted far less than the normal showing required" for injunctive relief under CPLR article 63 (Post v 120 E. End Ave. Corp., 62 NY2d 19, 25 [1984]).  Requests for a Yellowstone injunction are necessarily made in Supreme Court rather than Civil Court, which lacks authority to issue injunctive relief and, as such, may not be obtained in a summary proceeding under RPAPL article 7.  Yellowstone relief is not an end in itself but merely a means of maintaining the status quo by tolling a contractual cure period during a pending action, permitting a tenant who loses on the merits of the lease dispute to cure the defect and retain the tenancy.  Here, because plaintiffs' declaratory judgment action was barred by the lease waiver, there was no pending action in which to adjudicate the parties' rights and to support interim relief in the form of a Yellowstone injunction.  Indeed, the request was rendered academic by the dismissal of the complaint.

Plaintiffs' inability in this case to obtain Yellowstone relief does not prevent them from raising defenses in summary proceedings if commenced and thus vindicating their

rights under the leases if the owners' allegations of default are baseless. It is undisputed that the owner cannot evict plaintiffs without commencing a summary proceeding and establishing that plaintiffs materially breached the leases. Absent such a proceeding, plaintiffs remain in possession of the premises and their rights under the leases are undisturbed. If plaintiffs' defenses fail on the merits – if plaintiffs in fact breached the leases – then their interest in the tenancy would properly be extinguished under the plain language of the leases. Furthermore, if plaintiffs believe that the owner is not performing its respective obligations under the leases, they can bring an action in Supreme Court for breach of contract and request specific performance. Thus, a Yellowstone injunction is not essential to protect property rights in a commercial tenancy which, of course, are governed by the terms of the lease negotiated by the parties. As this Court has recognized, Yellowstone injunctions are useful procedural tools for tenants seeking to litigate notices of default (see Graubard, 93 NY2d at 514). But there is no strong societal interest in the ability of commercial entities to seek such a remedy that would justify voiding an unambiguous declaratory judgment waiver negotiated at arm's length, merely because this incidentally precluded access to Yellowstone relief.

Nothing in our statutory or decisional law suggests otherwise. The Legislature has made certain rights nonwaivable in the context of landlord-tenant law (see e.g. General Obligations Law § 5-321 [right to seek damages for injury caused by landlord's negligence]; RPAPL 235-b [right to habitability]; RPAPL 236 [right of a deceased tenant's estate to assign the lease when reasonable]) but has not precluded a commercial tenant's waiver of interim Yellowstone relief. Notably, the Legislature has recognized the utility

of Yellowstone-type relief for some residential tenants. RPAPL 753(4) (L 1982, ch 870) provides New York City residential tenants with a nonwaivable ten-day post-adjudication cure period at the conclusion of a summary proceeding and thus offers a losing tenant relief comparable to that obtained with a Yellowstone injunction in Supreme Court (i.e., the ability to cure a violation after a judicial determination that the tenant breached the lease) (Post, 62 NY2d at 26). The decision to provide this benefit only to a class of residential tenants indicates that the Legislature did not view this type of relief as fundamental for commercial tenants, believing that their rights were adequately protected under existing law, which included the availability of Yellowstone relief for parties who timely sought such an injunction. As remains true, at that time there was no appellate precedent suggesting that the right of commercial tenants to seek such relief could not be waived by the inclusion of unambiguous language to that effect in a negotiated lease. The Legislature was obviously aware of our strong public policy favoring freedom of contract, which is why it included the narrowly-crafted benefit among a group of rights expressly declared to be nonwaivable (RPTL 753[5]). Yet, the Legislature did nothing to alter the status quo for commercial tenants. Thus, notwithstanding plaintiffs' inability to obtain a Yellowstone injunction, we are unpersuaded that the voluntary declaratory judgment waiver by this sophisticated commercial tenant is void as against public policy.

The right to commence a declaratory judgment action, although a useful litigation tool, does not reflect such a fundamental public policy interest that it may not be waived by counseled, commercial entities in exchange for other benefits or concessions. Entities like those party to this appeal are well-situated to manage their affairs during negotiations,

and to conclude otherwise would patronize sophisticated parties and destabilize their contractual relationships – contrary to New York's strong public policy in favor of freedom of contract. Because the declaratory judgment waiver is enforceable, the action was properly dismissed.

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question not answered as unnecessary.

159 MP Corp v Redbridge Bedford

No. 26

WILSON, J. (dissenting):

"In New York, agreements at arm's length by sophisticated, counseled parties are generally enforced according to their plain language pursuant to our strong public policy favoring freedom of contract" (majority op at 1). Just so, but why? The majority's thesis

- 1 -

is our State's commitment to freedom of contract is so powerful that it cannot be overcome by competing public policies unless, for example, the legislature has criminalized object of the contract (majority op at 10) or has expressly stated a prohibition on waiver by statute (id. at 9). That thesis has little to do with this case. The public policy at play here, which requires us to disallow contractual provisions depriving a party of the ability to seek a declaratory judgment, is the freedom of contract itself. A contractual provision that forecloses a party from timely knowing its contractual obligations – instead forcing parties to gamble on the contract's meaning – undermines the contract and with it, society's benefit from the freedom of contract.

In any event, freedom of contract is not a limitless right. It should not be elevated above every other protection the law affords to litigants. The majority's decision today will result in the elimination of the "Yellowstone injunction", a common-law precedent that has existed in New York for more than half a century. That injunction allows commercial tenants to determine their responsibilities under the terms of their lease agreements without risking eviction. The Yellowstone injunction expresses a public policy of this state and is grounded in the legislature's century-old determination that New York's public policy broadly favors the availability of declaratory relief in preference to more protracted, costly and antagonistic litigation.

After this decision, commercial building owners and landlords will undoubtedly include a waiver of declaratory and Yellowstone relief in their leases as a matter of course. Those clauses will enable them to terminate the leases based on a tenant's technical or

dubious violation whenever rent values in the neighborhood have increased sufficiently to entice landlords to shirk their contractual obligations.   The majority insists that its decision represents the application of the well-settled public policy supporting freedom of contract. That notion of the unlimited primacy of contract rights is based on a jurisprudence discredited since the Great Depression. The majority's decision will alter the landscape of landlord-tenant law, and of neighborhoods, throughout the state for decades to come, absent legislative action.


I

What does "freedom of contract" mean, and why do we care about it?  I can enter in to an agreement with anyone about anything – I am "free" to contract in that sense, even if the agreement is not legally enforceable.  You and I can agree to have dinner next Thursday, and we can both think of it as to our advantage, but if one of us cancels, society has no interest in treating that agreement as enforceable, letting you sue me for damages, or compelling us to sup.  We make some agreements legally enforceable because of the societal benefit from doing so, not because of the benefit to the contracting parties *per se*. Of course, the parties who strike a legally enforceable bargain believe the bargain will benefit each of them individually, and it most often will, but that is also true of agreements that are not legally enforceable.

Another vantagepoint from which to understand that freedom of contract is not an individual right, but rather is grounded in the benefit to society at large, is the concept of

efficient breach. Damages for breach of contract are not punitive; they are calculated to make the nonbreaching party whole (see e.g. Freund v Washington Square Press, Inc., 34 N.Y.2d 379 [1974]). If the breaching party can put its goods or services to a (societally) higher use than what the contract requires even after fully compensating the nonbreaching party, that is a socially beneficial result: the nonbreaching party receives the full value of its bargain, the breaching party earns more, and society benefits in the process because the property is put to a higher use. That the breaching party also receives a benefit is not the purpose of the efficient breach – it is the engine that drives the party to breach so that the resources can be put to their best use.

So "freedom of contract" cannot properly be understood as an individual right of the contracting parties. "Commerce and manufactures can seldom flourish long in any state . . . in which the faith of contracts is not supported by law." (Adam Smith, Wealth of Nations at 710.) The free-market system is driven by the principle that contracting parties will reach agreements that maximize social welfare (output, thought of as price, quantity and quality) by maximizing their individual interests through bargaining in a market in which multiple buyers and sellers exist and transaction costs are as low as possible. The freedom of contract is of fundamental importance in society because it creates legally enforceable rights, on which the contracting parties can act now based on assurances about the future: contracts are a way that economic actors can obtain some measure of security about an otherwise uncertain future. "[T]he major importance of legal contract is to provide a framework for well-nigh every type of group organization and for well-nigh

every type of passing or permanent relation between individuals and groups." Karl N. Llewellyn, "What Price Contract? – An Essay in Perspective," 40 Yale L. J. 704, 736-37 (1931).

Freedom of contract is based on the understanding that "stability and predictability in contractual affairs is a highly desirable jurisprudential value" (Sabetay v Sterling Drug, 69 NY2d 329, 336 [1987]). "The traditional concerns of contract law, and warranty law in particular, are the protection of the parties' freedom of contract and *the fulfillment of reasonable economic expectations*" (Bellevue S. Assoc. v HRH Constr. Corp., 78 NY2d 282, 304 [1991] [emphasis added]). "It is clear that public policy and the interests of society favor the utmost freedom of contract" (Diamond Match Co. v Roeber, 106 NY 473, 482 [1887]). "[A] party may waive a rule of law or a statute, or even a constitutional provision enacted for his benefit or protection, where it is exclusively a matter of private right, and no considerations of public policy or morals are involved, and having once done so he cannot subsequently invoke its protection" (Sentenis v Ladew, 140 NY 463, 466 [1893]). However, "waiver is not permitted where a question of jurisdiction or fundamental rights is involved and public injury would result" (People ex rel. Battista v Christian, 249 NY 314, 318 [1928]).

Whether the state chooses to enforce certain types of agreements turns on whether enforcement would generally advance society's interests. Our rules about contract formalities, parol evidence, consideration, detrimental reliance, fraud, duress, illegality and so on are ways to cabin enforceability to the types of contracts from which society will

ordinarily benefit.  For example, since 1677, common law jurisdictions like New York have had some version of the statute of frauds, requiring that certain kinds of contract be in writing so that highly consequential matters (marriage, long-term contracts, etc.) must be in writing to be enforced (see General Obligations Law § 5-701).  Similarly, the parol evidence rule serves to clarify obligations by limiting the scope of a contractual dispute to its writing.

II

Declaratory judgments constitute another vital strand in this cord. Because the future is hard to predict, because even the best efforts at precision in language may wind up imprecise, because contracting parties sometimes deliberately avoid negotiating a contentious issue in the expectation that it will never transpire during the life of the contract, and because motivations change, courts since time immemorial have been asked to interpret agreements.  Declaratory judgment actions allow contracting parties to know their rights and obligations under a contract prior to breach (NY Pub. Interest Research Group, Inc. v Carey, 42 NY2d 527, 530 [1977] ["when a party contemplates taking certain action a genuine dispute may arise before any breach or violation has occurred and before there is any need or right to resort to coercive measures. In such a case all that may be required to insure compliance with the law is for the courts to declare the rights and obligations of the parties so that they may act accordingly. That is the theory of the declaratory judgment action authorized by CPLR 3001"]; see also 44 Report of New York

State Bar Ass'n, 194-96 [1921] ["congratulat[ing] the People of New York upon the adoption of this enlightened policy" that "enables parties to entertain an honest difference of opinion as to their rights, particularly under written instruments . . . without becoming enemies and undergoing a long expense."]).   That knowledge removes a material uncertainty (James v Alderton Dock Yards, Ltd., 256 NY 298, 305 [1931] ["The general purpose of the declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations"]). Uncertainty is itself a form of transaction cost that society has a clear interest in minimizing.   As but one example, a party's ability to determine that breach would be efficient depends on its knowledge as to the interpretation of the contract.[1]   "[C]ontract remedies should . . . give the party to a contract an incentive to fulfill [its] promise unless the result would be an inefficient use of resources" (Richard A. Posner, Economic Analysis of the Law, 56 [1972]).

Although superficially a private matter between contracting parties, the availability of declaratory judgments has far-reaching societal impacts.  Parties may enter into contracts that seem quite clear, only to later find the terms are ambiguous (see e.g., the famous "Peerless" case, Raffles v Wichelhaus, 2 H. & C. 906, 159 Eng. Rep. 375 [Exh. 1864]).

---

[1] Here, for instance, the landlord and tenant each claim that the other is responsible to resolve several lease violations, including the current configuration of a ventilation system. If the tenant knows it is liable, it might decide to terminate the lease; the landlord apparently has better offers for the space, so that the tenant could walk away without liability and the landlord could rent the space to a higher-paying tenant.  If the landlord knows it is liable, it may then determine whether it is more profitable to buy out the tenant and lease the space to a higher-paying tenant or to continue under the existing lease terms.

Because ambiguity often strikes, society has a powerful interest in adopting procedures that permit a timely and conclusive determination that preserves the object of the parties' bargain. We have previously extolled the virtues of stability and certainty, particularly with respect to real estate (see Estate of Thomson v Wade, 69 NY2d 570, 574 [1987]). Here, the majority has conflated the object of the bargain (the lease of space to a grocery store) with a procedural provision (the prohibition of a declaratory judgment action). The object of the contract – the lease of space – provides the societal value. The provision barring the tenant from seeking a declaratory judgment impedes that very value, by forcing a party (in this case, the tenant) either to refuse to replace the ventilation system and risk eviction if a court later determines that the tenant was responsible, or to replace the ventilation system (if within the tenant's wherewithal) and later institute an action of some sort to recover the costs of doing so if a court later determines that the landlord was responsible. Because the legal liability remains in limbo when the tenant must make that choice, the tenant's ability to consider an efficient breach (e.g., moving to a different space would be less expensive than paying for a compliant ventilation system, with which the landlord would be happy because it could rent the space to others at a higher price) is eliminated, and society's benefit is lost in the balance. Yes, both the use of the space and the declaratory judgment bar appear in the contract, but society's benefit derives from the former, and is defeated by the latter. The availability of declaratory judgments enhances the stability of contracts, allows deviations from the status quo to be done on an informed

basis, and allows the efficiency gains of the freedom of contract to be spread throughout the economic system – the fundamental purpose of "freedom of contract."

A waiver of the right to declaratory judgment, by contrast, creates instability by undermining the purposes and benefits of the freedom of contract, and the enforcement of such a waiver violates that very public policy. The ability to obtain declaratory relief is a part of our state's public policy because it is an essential part of the policy of freedom of contract. We should no more allow contracting parties – however sophisticated – to strike declaratory judgments than we would allow them to strike the parol evidence rule or the statute of limitations. The majority's fundamental mistake comes from treating "freedom of contract" as if it were an individual right, when its *raison d'etre* is the economic advancement of society.

That mistake is the same conceptual mistake made during the <u>Lochner</u> era, in which the United States Supreme Court aggrandized freedom of contract as if it were solely a personal right, rather than an important ingredient to the formation and advancement of society as a whole (<u>Lochner v New York</u>, 198 US 45 [1905]). There, the Supreme Court invalidated a law enacted by the New York Legislature to prevent the overwork of bakers. Here, the majority upholds a contractual provision that prevents the tenant (and notably, the tenant alone) from seeking a judicial declaration of the rights and obligation of the parties to a lease agreement. Today's decision, like <u>Lochner</u>, rests on "juristic thought of an individualist conception of justice, which exaggerates the importance of property and

of contract [and] exaggerates private right at the expense of public right" (Roscoe Pound, "Liberty of Contract," 18 Yale L.J. 454 at 457 [1909]).

III

When contractual obligations are unclear and disputed, a declaratory judgment affords the parties a conclusive determination, without the attachment of any damages or injunction. The availability of a pre-breach (or pre-enforcement) interpretation of disputed rights and obligations is incorporated by, but long predates, the common law.[2] In the Roman law of procedure, as in our own, actions at law resulted in an executory judgment, called a *condemnatio*, which decreed that something must be done, including that damages might have to be paid (see Edwin M. Borchard, *The Declaratory Judgment – A Needed Procedural Reform*, 28 Yale L.J. 1, 10 [1918]). Often, a preliminary procedure would be sought, known as *prae-judicium*, where parties merely asked for questions of law or fact to be determined, resulting in statements of law known as *pronunciato* (id. at 11). Those preliminary proceedings proved so advantageous they eventually developed into independent actions, without any *condemnatio* ever sought (id.).

The declaratory judgment continued to develop in Italy through the Middle Ages, including the creation of negative declaratory actions, or actions to declare that another does not have a claim against the plaintiff (id.). Upon the "reception" of Roman law into

---

[2] Even before Roman times, King Solomon issued a declaratory judgment, determining the rights of the parties without requiring either putative mother to abscond with the infant (Kings 3:16-28).

central Europe in 1495, both forms of declaratory judgment would have been known (id.). The declaratory judgment of the Middle Ages first made its way into common law countries through Scotland, with cases of "declarator" occurring as far back as the 1500s (id. at 21). England would adopt a form of the declaratory judgment in 1852, with a version much like what we know today adopted in 1883 (id. at 25).

That history is not some far-flung obscurity. Professor Borchard's 1918 article was the first written in the United States about declaratory judgments; three years later, the New York State Bar Association extolled the virtues of declaratory judgments, and referenced that history and Professor Borchard's work (New York State Bar Association, Proceedings of the 44th Annual Meeting, 194-96 [1921]). The next year, 1922, when the New York legislature first enacted the Civil Practice Act, a portion of that Act authorized declaratory judgments (see generally, Louis S. Posner, "Declaratory Judgments in New York," St. John's Law Review: Vol. 1 : No. 2 , Article 2. [1927]). Shortly after, the federal government and numerous other States legislatively created the right to seek declaratory judgments. Unlike the several states that modeled their legislation on the Commission on Uniform State Legislation's Uniform Declaratory Judgment Statute, New York's declaratory judgment statute afforded the courts broad leeway in issuing declarations, "based on the theory that the courts should be given as broad powers as possible so that their discretion under the statute be unfettered and that they should accordingly be free to work out their own rules as contingencies may arise" (id.). New York's adoption of the declaratory judgment was so swift that there is no formal legislative history. In its absence,

the history of the federal counterpart, passed shortly afterwards, are instructive. Both the Senate and House Reports note that England had a declaratory judgment act in 1852 and that Scotland's had existed for nearly 400 years (S Rep 1005, 73rd Cong, 2d Sess at 4; H Rep 1264, 73rd Cong, 2d Sess at 1). Both cite Professor Borchard and the history his work chronicled (id.). The reports recount a rapid and substantial movement: between 1919 and the U.S. Senate's report on the Declaratory Judgment Act, 34 states and territories had passed their own declaratory judgment laws (S Rep 1005, 73rd Cong, 2d Sess at 4). The Senate Report notes that our Chief Judge Benjamin Cardozo was one of the principal advocates supporting the federal Act (see id. at 1-2).

We know that the common law allowed suits that were *de facto* declaratory judgments long before this wave of declaratory judgment acts swelled. Suits to quiet title, declare marital status, declare the validity of a trust, or to declare the legitimacy of children are all declaratory judgments of one kind or another. Proponents of expanding declaratory judgments understood this (see id. at 4). When viewed in history properly, Civil Practice Act 473, now embodied in CPLR 3001 is not the start of declaratory judgments in this state, but is rather an expansion and legislative endorsement of a right with a deep legal history.

IV

The majority offers several arguments about why, "under the circumstances of this case," we should enforce the parties' agreement barring the courts from making a

declaration of their rights and obligations: (A) barring declaratory relief does not bar all resort to the courts; (B) agreements to arbitrate are enforceable, and those are a greater bar to the courts than the elimination of declaratory judgments; (C) many constitutional and statutory rights are waivable, so the right to a declaratory judgment must also be waivable; and (D) "only a limited group of public policy interests have been deemed sufficiently fundamental to outweigh the public policy favoring freedom of contract." I address each in turn.

## A

By observing that "[c]ritically, the waiver clause at issue here does not preclude access to the courts but leaves available other judicial avenues," the majority concedes that public policy would void a contractual provision that barred the contracting parties from all forms of judicial or quasi-judicial (arbitral) resolution. That concession makes sense, it comports with our cases voiding arbitration agreements as inimical to the common law (discussed below), and it reaffirms the central failure of the majority's thesis: freedom of contract is not merely an individual right (were it so, we would allow contract disputes to be determined by any means to which the parties agreed, including no means at all). Instead, the agreements society will enforce as binding are those of a type that generally improve output for society, because freedom of contract is rooted in its benefit to society. Although the clause in question does not absolutely bar judicial review, it obstructs it in clear contravention of public policy and the common law.

From the time the legislature enacted the declaratory judgment act through its present incarnation as CPLR 3001, the statute has always granted parties the right to seek a declaratory judgment "whether or not further relief is or could be claimed." Thus, when the majority relies on the availability of other avenues of redress as the reason to enforce a clause barring declaratory judgments, it contravenes the legislature's express command: declaratory actions are available regardless of the availability of other avenues for judicial review. Again, because society has an interest in the determination of the parties' contractual obligations, and because that interest is the basis for devoting society's resources to the enforcement of contracts in the first place, public policy demands that such clauses are unenforceable.[3] The public interest in declaratory relief is patent in cases like this, involving a commercial lease. Certainty and stability in the contractual affairs of a neighborhood grocery has consequences for local residents and employees, not merely for the grocer. The majority allows parties to contract away those societal benefits, which we

_____

[3] The majority' reliance on James v Alderton Dock Yards and Kalisch-Jarcho (majority op at 12) is misplaced. In James, we upheld the denial of declaratory relief as an appropriate exercise of the trial court's discretion: "The use of a declaratory judgment, while discretionary with the court, is nevertheless dependent upon facts and circumstances rendering it useful and necessary" (James v Alderton Dock Yards, Ltd., 256 NY 298, 305 [1931]). Likewise, in Kalish-Jarcho (72 NY2d 727 [1988]), the contract between the City and the contractor required the contractor to continue with work even if the obligation to do the work was contested, subject to payment for the additional work at the contract's end. The denial again was for discretionary reasons. Neither case upholds the validity of a provision purporting to extinguish the right to seek a declaration, because the contracts in those cases had no such provision. Even were we to strike as void against public policy the provision at issue here, nothing would prevent Supreme Court from denying declaratory relief or the Yellowstone injunction in a proper exercise of its discretion.

would never allow for a statute of limitations or the parol evidence rule, even though the societal benefits of the latter are more abstract and attenuated.

B

The common-law entitlement to judicial determination of contractual disputes is quite powerful, to be overcome by legislative action (narrowly construed) or a judicial modification of the common law based on some more important public policy. In that regard, the majority's framework is backwards, assuming instead that parties are free to avoid judicial (and, with arbitration now firmly established by statute, quasi-judicial) resolution of disputes if they so desire.

One would not understand, from the majority's opinion, that New York common law condemned arbitration clauses as contrary to public policy, and thus unenforceable, because arbitration agreements purported to bar parties from the courts (Meacham v Jamestown, F. & C. R. Co., 211 NY 346, 354 [1914] [J. Cardozo concurring: "If jurisdiction is to be ousted by contract, we must submit to the failure of justice that may result from these and like causes. It is true that some judges have expressed the belief that parties ought to be free to contract about such matters as they please. In this state the law has long been settled to the contrary"]). Ousting jurisdiction by contract is precisely what the majority seeks to legitimate by theorizing that a party might obtain "a valuable benefit, such as a rent concession" in exchange for waiving the right to a declaratory judgment (majority op at 13). So too might a party obtain that same benefit by waiving all judicial and arbitral resolution of contract disputes, or by waiving the statute of limitations or the

rules of evidence. Thus, neither the benefit to a party nor the expectation of the parties determines whether our public policy is violated.

New York's policy was in line with other common-law courts, which had been deeply suspicious of arbitration for centuries, dating back to England (see Angelina M. Petti, Note, *Judicial Enforcement of Arbitration Agreements: The Stay-Dismissal Dichotomy of FAA Section 3*, 34 Hofstra L. Rev. 565, 570-71 [2005]). New York was at the forefront of the nationwide shift in attitude toward arbitration clauses, with the Arbitration Act, passed in 1920, serving as a template for the federal act passed five years later. The Court of Appeals accepted that legislative derogation of the common law, albeit with a strong caveat: "The new policy does not mean that there is to be an inquisition rather than a trial, and that evidence unknown to the parties and gathered without notice may be made the basis of the judgment" (Stefano Berizzi Co. v Krausz, 239 NY 315, 319 [1925][J. Cardozo writing for the Court]).

Given the above, addressing the majority's argument about arbitration agreements is short work. The legislature modified the common law in 1920 to make arbitration agreements enforceable, against a common law that voided them as contrary to public policy. Having expressly provided that declaratory relief is available "whether or not further relief is or could be claimed," the legislature never provided that private parties could contract otherwise. Ironically, the majority now justifies the contractual elimination of the legislature's grant by relying on the "availab[ility of] other judicial avenues" (majority op at 13).

The majority's claims about arbitration ignore the above history and, thus, erroneously invert the presumption against the derogation of the common law (Fitzgerald v Quann, 109 NY 441, 445 [1888] ["the rule to be well established and almost universally acted on, that statutes changing the common law must be strictly construed, and that the common law must be held no further abrogated than the clear import of the language used in the statutes absolutely requires"]; Morris v Snappy Car Rental, 84 NY2d 21, 28 [1994] ["It is axiomatic concerning legislative enactments in derogation of common law . . . that they are deemed to abrogate the common law only to the extent required by the clear import of the statutory language"]; Artibee v Home Place Corp., 28 NY3d 739, 748 [2017] ["Because CPLR 1601 is a statute in derogation of the common law, it must be strictly construed"]). The common law has always been suspicious of clauses seeking to limit access to the courts. The history of arbitration clauses demonstrates precisely the opposite of what the majority has concluded.

C

That certain rights afforded to individuals are waivable is true but uninteresting and irrelevant here.[4] Television workers may alter their statutory meal breaks through

---

[4] The majority's observation that the legislature has specified that several types of agreements are void as against public policy (majority op at 9) is true but irrelevant. No one disputes the legislature's ability to do so (query, then, whether the purported force of the freedom of contract is so great as the majority claims), but the legislature's ability to declare contractual terms void as against public policy does not disable the common law from doing so as well. The cases the majority cites for the proposition that the legislature's failure to preclude a waiver is "a significant factor militating against invalidation of a contract term on public policy grounds" (id. at 10) do not support that proposition at all. Ballentine v Koch (89 NY2d 51 [1996]) contains no such statement; it rejected the

collective bargaining (Am. Broadcasting Cos. v Roberts, 61 NY2d 244 [1984]), and teachers may waive the Education Law's tenure protections (Matter of Abramovich v Board of Educ. of Cent. School Dist. No. 1 of Towns of Brookhaven & Smithtown, 46 NY2d 450 [1979]).  Those rights are personal, and we leave it up to each individual to determine whether that individual would be personally advantaged by asserting or relinquishing those rights in a particular situation.  As explained above, the freedom to contract is not a purely individual right; it is a societal engine for growth and stability.

A criminal defendant may prefer to testify than to remain silent; another may make the opposite choice.  Society is indifferent to the choice made, so long as it is knowing and voluntary.  Society, however, is not indifferent to whether contracting parties can obtain a quick determination of their rights and obligations before they must or may take actions that would be better informed (and often different) with a declaration in hand.  We, as a

plaintiffs' claim because "they attack as unenforceable an aspect of the legislation that was necessary to the creation of the rights they seek to enforce," and rejected their Contract Clause argument to boot.  Matter of Abramovich v Board of Educ. of Cent. School Dist. No. 1 of Towns of Brookhaven & Smithtown (46 NY2d 450 [1979]) is not a case in which the legislature was silent; instead, we concluded the waiver there was not against public policy because the statue affirmatively "authorized waiver by simple neglect" and the "waiver serves as the quid pro quo for countervailing benefits."  Matter of Feinerman v Board of Coop. Educ. Servs. of Nassau County (48 NY2d 491 [1979]) says nothing about legislative inaction, but instead is merely a follow-on to Abramovich concluding that nontenured faculty have, *a fortiori*, less of a property interest than tenured faculty, and therefore also can waive the rights determined waivable in Abramovich.  Only Slayko mentions legislative inaction, but expressly conditions it on the rejection of the plaintiff's attempt to analogize the highly regulated field of automobile insurance to homeowner's insurance: "Cases involving auto insurance coverage--an area in which the contractual relationship and many of its terms are prescribed by law--provide a weak basis for generalization about the constraints public policy places upon other insurance contracts" (Slayko v Sec. Mut. Ins. Co., 98 NY2d 289, 295 [2002]).

society, are not benefitted or burdened by the defendant's choice; we are burdened when a contracting party's choice is made based on guesswork as to contractual rights, and benefitted when contracting parties make decisions informed by knowledge of their rights and obligations. Indeed, the majority's tacit admission that parties cannot contractually waive all judicial and quasi-judicial review, like our common-law decisions voiding arbitration clauses before the legislature stepped in, demonstrates the fundamental difference between the waivable rights to which the majority points and clause barring declaratory relief at issue here.

### D

The proposition that only a "limited group of public policy interests" is sufficiently strong to overcome freedom of contract is both wrong and irrelevant here. It is wrong for the following reason: most law-abiding people do not enter into agreements that are against public policy. Countless parties enter into agreements to violate criminal and civil laws; those laws embody thousands of public policies, but those parties do not come to court to seek enforcement of agreements to traffic drugs or people or to recover damages from an illicit stock tip gone bad. Instead of the majority's sweeping claim, a more accurate statement would be that there are a modest number of cases in which the courts have voided an agreement as against public policy, because that circumstance arises only when the alleged violation of public policy is a close call.

The majority's proposition is also irrelevant here: it describes when a public policy other than the freedom to contract is sufficient to outweigh the freedom to contract. Here,

the issue is whether the public policy underlying the freedom to contract <u>itself</u> voids the purported declaratory judgment bar, not whether some distinct public policy voids it. As discussed previously, freedom of contract is vital because of the benefits that flow to society – not because of any individual right to have the government enforce agreements between parties. As the legislature recognized when it provided for a declaration of rights regardless of the existence of other remedies, society is benefitted when disputes between contracting parties can be resolved by a declaration of rights, and injured when parties must guess and act at their peril.

V

This case offers a concrete illustration of why the public policy underlying freedom of contract requires voiding contractual provisions barring declaratory judgments. In 2010, 159 MP Corp. and 240 Bedford Ave Realty Holding Corp. (herein, collectively "MP") entered into 20-year leases for retail and storage space in which to operate a Food Town grocery store in the Williamsburg section of Brooklyn. Two years later, the lessor, BFN, sold the building to Redbridge Bedford, LLC. In 2014, Redbridge Bedford sent MP a "Ten (10) Day Notice to Cure Violations." The notice alleged that the site had had work done without proper approvals from city agencies, that the store configuration violated lease terms, that city agencies had improperly been denied access to the premises to inspect the sprinkler system, and that the ventilation system violated the lease and had to be removed.

MP disputes all the violations, asserting they either depend on misreadings of the lease or on factual inaccuracies.

MP filed a verified complaint asserting four causes of action: (1) a request for a declaration that the lease was in effect and no violations had occurred; (2) a request to enjoin Redbridge Bedford from taking any steps to terminate the lease; (3) a claim to estop Redbridge Bedford from asserting violations, if any, to which it and BFN had consented; and (4) a claim for damages. To preserve the status quo, MP also sought a Yellowstone injunction, which would toll the cure period during the pendency of the action.

Redbridge Bedford moved for summary judgment on the ground "that the mere commencement of the declaratory judgment action constituted contractual grounds for terminating the tenancies" (159 MP Corp. v Redbridge Bedford, LLC, 160 AD3d 176, 181 [2d Dept 2018]). The contractual provision on which Redbridge Bedford relied states that MP:

> "waives its right to bring a declaratory judgment action with respect to any provision of this Lease or with respect to any notice sent pursuant to the provisions of this Lease. Any breach of this paragraph shall constitute a breach of substantial obligations of the tenancy, and shall be grounds for the immediate termination of this Lease. It is further agreed that in the event injunctive relief is sought by Tenant and such relief shall be the Owner shall be entitled to recover the costs of opposing such an application, or action, including its attorney's fees actually incurred, it is the intention of the parties hereto that their disputes be adjudicated via summary proceedings."

Both Supreme Court and the Appellate Division denied MP's request for a Yellowstone injunction on the basis of the above contractual provision.

The Yellowstone injunction derives from First Natl. Stores, Inc. v Yellowstone Shopping Ctr., Inc. (21 NY2d 630 [1968]).  In that case, we held that a tenant's failure to obtain a temporary restraining order prior to the expiration of the 10-day cure period in the lease deprived the court of the power to extend the cure period (id. at 637-38).  In so doing, we implicitly endorsed what would come to be known as the Yellowstone injunction, which allows the court to stay the running of a cure period so that tenants may obtain a declaration as to the existence of an alleged lease default and retain the ability to cure such default once their obligations have been determined.  The Yellowstone injunction is an important adjunct to one type of declaratory judgment action, in which a tenant threatened with eviction based on debatable claims of breach may obtain a judicial resolution of the debate before deciding whether to cure, to remain with no need to cure, or to accept the eviction.  Although CPLR 3001 (and its predecessor) does not mention the prospect of judicial extension of a contractual cure period, we explained that "'declaratory relief is *sui generis* and is as much legal as equitable' . . . Thus, in a proper case a court has the fullest liberty in molding its decree to the necessities of the occasion" (21 NY2d 630, 637 [1968] [quoting Borchard, Declaratory Judgments (2d ed.), p. 239]).

MP has been operating a grocery store in a neighborhood that has undergone, and continues to undergo, rapid gentrification, rendering the real estate substantially more valuable.  Its lease is for 20 years, with a further 10-year renewal option. It would like to keep operating the grocery store under the lease terms.  Redbridge Bedford would, undoubtedly, like to terminate the lease and make a greater profit from it.  Let us assume

that there is a legitimate dispute about whether the violations identified by Redbridge Bedford are MP's obligation to cure. The declaration sought by MP, coupled with the Yellowstone injunction, would allow MP to learn which, if any, of the claimed violations it is obligated to cure, and could then decide whether to cure any for which it is responsible or agree to termination of the lease. Enforcement of the waiver provision eliminates that possibility, requiring MP to take one of the following courses without the benefit of knowing its contractual liability: (1) cure all the alleged defects, even though it might be responsible for none of them; (2) cure none or some of the alleged defects, guessing which, if any, it may be held responsible for, and defend an eviction proceeding hoping that it has guessed correctly; or (3) accept termination of the lease because the eviction proceeding's result is too uncertain, and attempt to move its business elsewhere or shut it down.

The majority protests that MP and all other commercial tenants who waive declaratory and Yellowstone relief in their leases are left with "other judicial avenues through which [they] may adjudicate their rights under the leases" (majority op at 13). The only available legal avenue left to MP, however, as the majority acknowledges, is to wait for Redbridge Bedford to commence summary eviction proceedings in Civil Court and then raise any defenses it may have against the allegations of default in that summary proceeding (see majority op at 13).

Notably, the waiver provision at issue here prevents only the tenant from commencing a declaratory judgment action to clarify its rights and responsibilities. The leases permit Redbridge Bedford to commence a declaratory judgment action at will. As

the dissenting Justice of the Appellate Division noted, MP is completely at the mercy of Redbridge Bedford to commence such summary eviction proceedings before it may raise any defenses it has to the allegations of default (see 160 AD3d 176, 206-207 [2d Dept 2018] [Connolly, J., dissenting]).  "In other words, the plaintiffs, having been boxed into a corner, would be entirely dependent on the defendant commencing a summary proceeding in order to bring the issue of the validity of a notice to cure before a court" (id.).  Such a tenant "would be faced with great uncertainties with respect to any decision-making related to improving the property, accepting deliveries of new stock or merchandise, or the negotiation of any type of long-term agreement with customers or suppliers" (id.).

Furthermore, as the majority acknowledges (majority op at 15-16), the waiver provision at issue here prevents MP from obtaining a Yellowstone injunction, even though it did not mention Yellowstone itself, because the tenants were limited to defending themselves in summary eviction proceedings commenced by Redbridge Bedford in Civil Court, and Civil Court lacks plenary authority to grant injunctive relief (see  New York City Civil Court Act § 209 [b]).  If Civil Court therefore determines during the summary eviction proceeding that MP is responsible for some or all of the alleged defaults, even if MP has all along been willing and able to cure those defaults, it will be too late: the leases will have terminated.  That "all or nothing result" (Post v 120 E. End Ave. Corp., 62 NY2d 19, 25 [1984]) destabilizes contract relationships and neighborhoods, and effectively allows landlords who own buildings in gentrifying areas to terminate commercial leases at any time based on technical or minor violations.  In other words, if a waiver of declaratory

and <u>Yellowstone</u> relief is enforceable, it will be used by landlords as a mechanism to vitiate a lawful contract. That does not preserve the parties' benefit of their bargain, it destroys it.

"The public policy behind Yellowstone relief is not difficult to envision: commercial enterprises leasing business locations have a vested interest in remaining at the locations known to their customers, their premises are often fitted with industry-specific fixtures, and commercial evictions disrupt employments and potential business profitability" (Hon. Mark C. Dillon, "The Extent to Which 'Yellowstone Injunctions' Apply in Favor of Residential Tenants: Who Will See Red, Who Can Earn Green, and Who May Feel Blue," 9 Cardozo Pub. L. Pol'y & Ethics J. 287, 315-316 [2011]). The majority's elimination of the clearly best option – knowing one's rights before determining whether and what action to take – strikes at the very core of declaratory judgments. One of the very first decisions under the then-new declaratory judgment act closely parallels the present case:

> "Plaintiff urges that this construction imposes upon the lessee the risk of forfeiture if he subleased and points out the practical difficulty of finding a subleasee under such circumstances (<u>Young v. Ashley Gardens Properties</u>, Ltd., L. R. [1903] 2 Ch. Div. 112), shows the remedy. There plaintiff sought a declaratory judgment that defendant had no right to withhold consent. Cozens-Hardy, L. J. writes: 'I cannot imagine a more judicious or beneficial exercise of the jurisdiction to make a declaratory order than that which has been adopted in this case.' Under Section 473 of the Civil Practice Act, plaintiff may, if the facts warrant, secure a similar declaration in the instant case"

(<u>Sarner v Kantor</u>, 123 Misc. 469 [1924]). The majority allows a lease provision to undo the legislature's creation of declaratory judgments, the common-law's rejection of contractual

provisions purporting to remove judicial interpretation of contracts, and the longstanding efforts of our court and the lower courts thereafter in fashioning the Yellowstone injunction, which, after fifty years of unquestioned existence, itself is engrained in the common law.

The majority's newfound dismissiveness towards Yellowstone cannot be justified by its observation that the legislature has granted a 10-day post-adjudication cure period for New York City residential tenants and made that cure period unwaivable (see RPAPL 753 [4], [5]). The majority reasons that the legislature's decision to provide that benefit "only to a class of residential tenants indicates that the Legislature did not view this type of relief as fundamental for commercial tenants" (majority op at 17). To the contrary, the legislature did not enact this particular protection for residential tenants in New York City until 1982 (see L 1982, ch 870; see Post, 62 NY2d at 22-24). By that time, Yellowstone injunctions had been a long-established method for commercial tenants to preserve their right to cure if they were alleged to be in default of their lease agreements. It is entirely likely, then, that the legislature extended this protection to certain residential tenants in 1982 but did not extend it to commercial tenants because the legislature believed that Yellowstone itself already adequately protected the rights of commercial tenants. Indeed, a one-size-fits-all 10-day post-adjudication cure period might be appropriate for residential tenants, whereas commercial tenants, whose uses are more specialized and varied, would best be left to the court's discretion to determine the length and nature of any post-adjudication cure period. The majority's reasoning is backwards, drawing a negative

inference about our jurisprudence from the legislature's provision of a fixed post-adjudication cure period to residential tenants. At most, this would qualify as longstanding legislative inaction in the face of well-established common law, which we typically construe as approval (see People v Defore, 242 NY 13, 23 [1926] [Cardozo, J.] ["If we had misread the statute or misconceived the public policy, a few words of amendment would have quickly set us right. The process of amendment is prompt and simple. It is without the delays or obstructions that clog the change of constitutions. In such circumstances silence itself is the declaration of a policy"]). By holding today that commercial tenants may waive declaratory and Yellowstone relief, the majority is effectively unwinding 50 years of common-law precedent based in part on erroneous assumptions about the legislature's intent.

The majority appears to assume that commercial tenants have a relatively higher level of sophistication and bargaining power than residential tenants, and therefore commercial tenants should be allowed to waive the availability of Yellowstone relief even though some residential tenants cannot (see RPAPL 743 [4], [5]). Indeed, the majority states several times that "sophisticated" commercial tenants should be allowed to waive their right to declaratory relief. A contract provision that violates public policy, however, cannot be enforceable regardless of the level of the sophistication of the parties (see 160 AD3d at 207 [Connolly, J., dissenting]; see e.g. Riverside Syndicate, Inc. v Munroe, 10 NY3d 18 [2008] [wherein a sophisticated tenant bargained away the rent limits of the Rent Stabilization Code as part of an eviction settlement that allowed his tenancy to continue

despite being a non-primary residence]; <u>see</u> <u>also</u> <u>Bissell v Michigan S. & N. I. R. Cos.</u>, 22 NY 258, 285 [1860] ["That contracts which do in reality contravene any principle of public policy are illegal and void, is not and cannot be denied. The doctrine is universal. There is no exception"]). Furthermore, there is no evidence on this record demonstrating the sophistication of these particular tenants.[5] The majority assumes that because they were commercial tenants, they were sophisticated. The level of sophistication of commercial tenants, and their relative bargaining power, may fall anywhere between Wal-Mart and *Cheers*' Sam Malone. It is not true that all commercial tenants will understand the meaning of a waiver of declaratory relief, or will have the bargaining power to negotiate for removal of such a waiver if they understand it, and we should not assume otherwise.

VI

The majority has now undone the faithful work of the courts over the past 50 years in creating the <u>Yellowstone</u> injunction, based on the uniform understanding of the Appellate Division departments that the declaratory judgment act, when applied in the context of commercial leases, requires a specialized form of augmenting injunction (<u>see</u> (<u>Another Slice, Inc. v 3620 Broadway Invs. LLC</u>, 90 AD3d 559, [1st Dept 2011], <u>Caldwell v Am. Package Co., Inc.</u>, 57 AD3d 15, 18 [2d Dept 2008], <u>Kem Cleaners v Shaker Pine</u>,

---

[5] The majority not only asserts that plaintiffs were "sophisticated" but also that they were "counseled" (majority op at 11, 17). There is no evidence in the record before us that plaintiffs reviewed the lease terms with counsel. Supreme Court concluded that plaintiffs had the "opportunity" to review the leases with the assistance and guidance of counsel, not that such assistance and guidance actually occurred.

217 AD2d 787 [3d Dept 1995], <u>Fay's Inc. v Park Ctr. Dev.</u>, 226 AD2d 1067 [4th Dept 1996]).  That undoing calls for a simple enough legislative fix.  The far more troubling aspect of the majority's decision is that it, perhaps unwittingly, heads us down the road of the roundly discredited <u>Lochner</u>-era jurisprudence, in which "freedom of contract" was misunderstood as an individual right instead of as a doctrine by which society decides to enforce only those types of agreements that tend to enhance social welfare.  "[F]reedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses" (<u>West Coast Hotel Co. v Parrish</u>, 300 US 379, 392 [1937] [quoting <u>Chicago, B. & Q. R. Co. v McGuire</u>, 219 US 549, 567 (1911) and overruling <u>Adkins v Children's Hosp.</u>, 261 US 525 (1923) and <u>Lochner</u>]).

It is easy to see why freedom of contract is enhanced when the parties, arriving at a dispute about what a contract requires, can have that dispute resolved and then act accordingly.  That best preserves the substance of their bargain and provides assurance to future negotiating parties that our law will not require a Hobson's choice of them.  Conversely, what reason is there to allow parties to agree to bar declaratory judgments, other than "the-parties-agreed-to-it-so-it-must-be-their-right"?  As Charles Evans Hughes commented in support of New York's declaratory judgment act, "[w]hatever may be said as to the propriety of desirability of such a change in practice, the point that anybody will be injured in that way cannot be regarded as well taken" (New York State Bar Association, 196).  We deserve better than the majority's resuscitation of the long-discredited "assumption that economic liberty is the holy of holies in a just constitutional system"

(Robert Green McCloskey, American Conservatism in the Age of Enterprise 83 [1951]).

"I regret sincerely that I am unable to agree with the judgment in this case, and that I think it my duty to express my dissent" (Lochner, 198 US at 74-75 [Holmes, J., dissenting]).

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order affirmed, with costs, and certified question not answered as unnecessary.  Opinion by Chief Judge DiFiore.  Judges Stein, Garcia and Feinman concur.  Judge Wilson dissents in an opinion in which Judges Rivera and Fahey concur.

Decided May 7, 2019